[No. 75626-1. En Banc.]
Argued February 15, 2005. Decided November 3, 2005.

*In the Matter of the Parentage of L.B.*

SUE ELLEN ("MIAN") CARVIN, *Respondent,* v. PAGE BRITAIN, *Petitioner.*

---

*Brian H. Krikorian* and *Erica Krikorian*, for petitioner.

*Patricia S. Novotny; Janet M. Helson* (of *Skellenger, Bender, P.S.*); and *Nancy L. Sapiro* (of *Northwest Women's Law Center*), for respondent.

*Lorraine A. Rimson* on behalf of Amara Parenting and Adoption Services, Children of Lesbians & Gays, and Washington State Court Appointed Special Advocates, amici curiae.

*H. Michael Fields* on behalf of American Academy of Matrimonial Lawyers, amicus curiae.

*Aaron H. Caplan* and *Leslie Cooper* on behalf of American Civil Liberties Union of Washington and Lesbian & Gay Rights Project of the American Civil Liberties Union, amici curiae.

*Katherine H. Federle, Angela Lloyd,* and *Lisa K. Barton* on behalf of Justice for Children Project, amicus curiae.

*Jamie D. Pedersen, Laura K. Clinton, Kristin J. Boraas, Shannon Minter, Courtney Joslin,* and *Jennifer C. Pizer* on behalf of National Center for Lesbian Rights & Children of Lesbians & Gays, amicus curiae.

¶1 BRIDGE, J. — In 1989, after dating for several months, Page Britain and Sue Ellen ("Mian") Carvin began living together as intimates. Five years later, they decided to add a child to their relationship and together artificially inseminated Britain with semen donated by a male friend. On May 10, 1995, Britain gave birth to a baby girl, L.B., and the partners began actively coparenting her, both taking a committed, active, and loving role in her nurturing and upbringing. Then, when L.B. was six years old, Britain and Carvin ended their relationship and an acrimonious spate of litigation over access to L.B. ensued.

¶2 We must now determine whether Sue Ellen Carvin, who is neither a biological nor adoptive parent, has standing under Washington law to petition our courts for a determination of coparentage with regard to L.B. We conclude that she does. We are also asked to decide, in the alternative, whether Carvin has standing to assert rights to visitation with L.B. under Washington statute. We conclude that she does not.

¶3 The equitable power of the courts to adjudicate relationships between children and families is well recognized, and our legislature has evinced no intent to preclude the application of an equitable remedy in circumstances such as these. Accordingly, we now hold, as did the Court of Appeals, that Washington's common law recognizes the status of *de facto* parents and grants them standing to petition for a determination of the rights and responsibilities that accompany legal parentage in this state. Therefore, Carvin should have the opportunity to present evidence to the court sufficient to establish her status as a *de facto* parent of L.B. and if successful to obtain the rights and responsibilities attendant to parentage. However, because we have previously held Washington's third party visitation statutes to be unconstitutional and thereby inoperative, we reverse the Court of Appeals' alternative holding that Carvin may petition for visitation pursuant to RCW 26.10.160(3).

I

Facts and Procedural History

¶4 Carvin and Britain became romantically involved in a same-sex relationship in June 1989 and cohabitated from September 1989 until February 2001. In 1994 the couple jointly decided to conceive and raise a child. A close male friend of theirs, John Auseth, agreed to donate sperm to assist in their efforts. The parties conducted the artificial insemination in their home, with Carvin personally insemi-

nating Britain with the donor sperm.[1] Carvin accompanied Britain to her prenatal appointments, and they participated together in prenatal birthing classes. On May 10, 1995, Carvin was present at and assisted in the birth of L.B. When she was born, the parties gave L.B. family names representing both Carvin's and Britain's families. In L.B.'s baby book, Britain listed herself under "mother" and altered "father" to also read "mother," listing Carvin. Clerk's Papers (CP) at 112-13.

¶5 For the first six years of L.B.'s life, Carvin, Britain, and L.B. lived together as a family unit and held themselves out to the public as a family. Carvin and Britain shared parenting responsibilities, with Carvin actively involved in L.B.'s parenting, including discipline decisions, day care and schooling decisions, and medical care decisions. Both parties were named as "parents" on L.B.'s kindergarten and first grade records. While the parties now dispute the nature of their relationship and the extent of Carvin's role as a "mother," as the Court of Appeals notes, "the record reflects that Carvin provided much of the child's 'mothering' during the first six years of her life." *In re Parentage of L.B.*, 121 Wn. App. 460, 467, 89 P.3d 271 (2004). This conclusion is supported by the fact that L.B., in her interactions with the two women, referred to Carvin as " 'mama' " and Britain as " 'mommy.' " *Id.*[2]

¶6 L.B. was nearly six years old when the parties ended their relationship. After initially sharing custody and

---

[1] Carvin alleges that she, Britain, and Auseth all signed notarized documents agreeing that Carvin and Britain would be the parents of the child and that Auseth would have no involvement. While these documents are not part of the record, Britain admits to their existence but claims she is unaware of their whereabouts and has no recollection of their contents.

[2] While the parties continue to dispute various aspects of the nature of their relationship prior to and after the birth of L.B. and the role Carvin played in L.B.'s life, we are not charged with resolving any factual disputes. *See, e.g., State v. Valentine*, 132 Wn.2d 1, 23, 935 P.2d 1294 (1997) ("Resolution of factual disputes is a task for the trier of fact, not this court."). Further, as this case was essentially dismissed for lack of standing and thus failure of Carvin to state a claim, for purposes of our review we consider any factual disputes in Carvin's favor. *See, e.g., Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.*, 134 Wn.2d 692, 698, 952 P.2d 590 (1998).

parenting responsibilities, Britain eventually took measures to limit Carvin's contact with L.B. and in the spring of 2002, unilaterally terminated all of Carvin's contact with L.B. L.B. was then seven years old.

¶7 Seeking to continue her relationship with L.B., on November 15, 2002, Carvin filed a petition for the establishment of parentage in King County Superior Court.[3] In it she sought, in relevant part, (1) that she be declared the legal parent of L.B. pursuant to the Uniform Parentage Act (UPA), chapter 26.26 RCW, (2) that she be declared a parent by equitable estoppel or that she be recognized as a *de facto* parent, and finally (3) that she be allowed statutory third party visitation rights.

¶8 On December 13, 2002, the family court commissioner dismissed Carvin's petition based on a determination that Carvin lacked standing under the UPA and that the UPA does not grant standing to "psychological" parents. CP at 298. The commissioner further declined to order visitation pursuant to chapter 26.10 RCW. Carvin moved for a revision of the commissioner's ruling. On revision, the trial judge found that "there is a substantial relationship between Petitioner Carvin and the child in this case" and that "both parties care deeply" for the child. CP at 311. He further found neither Britain nor Carvin to be "unfit." *Id.* at 312. Finally, he found that "[t]here is a substantial showing in the record that terminating visitation between [Carvin] and the child harmed the child . . . ." *Id.* However, he "reluctantly" affirmed the commissioner's ruling on all three grounds, holding that Carvin lacked standing under the UPA and as a *de facto* parent and finally that if the third party visitation statute survived *In re Custody of Smith*, 137 Wn.2d 1, 969 P.2d 21 (1998), *aff'd on other grounds sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) and *Troxel*, there must be a prerequisite

---

[3] Shortly thereafter, in a strange twist of events, and admittedly in response to Carvin's initiation of legal action, Britain and Auseth, the sperm donor, married. CP at 91-92, 193-98. Auseth signed a paternity affidavit and the parties requested an amended birth certificate for L.B., listing Auseth as the "father." *Id.* Auseth, however, is not a party to this action, and his whereabouts are unknown.

showing of parental unfitness in order to grant visitation rights and that none had been shown. *Id*. at 312-14.

¶9 Carvin appealed. The Court of Appeals agreed that Carvin lacked standing under the UPA but reversed the superior court on the other two grounds, determining that the legislature's omission of any language addressing the legal rights of parties to familial relationships such as the one presented here does not imply the complete denial of remedy but rather leaves the matter to be resolved by common law. *In re Parentage of L.B.*, 121 Wn. App. at 475-76. Then, relying on the persuasive authority of other state courts that have recognized the common law rights of *de facto* parents, the court held that a common law claim of *de facto* or psychological parentage exists in Washington separate and distinct from the parameters of the UPA and that such a claim is not an unconstitutional infringement on the parental rights of fit biological parents. *Id.* at 485. The Court of Appeals held that a *de facto* parent may prove the existence of a parent-child relationship by presenting evidence sufficient to prove:

> (1) the natural or legal parent consented to and fostered the parent-like relationship; (2) the petitioner and the child lived together in the same household; (3) the petitioner assumed obligations of parenthood without expectation of financial compensation; and (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

*Id.* at 487. Finally, the Court of Appeals reinstated Carvin's alternative petition for third party visitation pursuant to RCW 26.10.160(3). *Id.* at 488. The court distinguished this case from grandparent visitation in *Troxel* and held that Carvin "does not need to prove that Britain is unfit in the classic sense, but only that it is detrimental to the child to sever the very parent-child relationship that Britain first consented to and fostered." *Id.* at 489.

¶10 Britain petitioned this court for review, which we granted.[4]

## II

## Analysis

¶11 In the face of advancing technologies and evolving notions of what comprises a family unit, this case causes us to confront the manner in which our state, through its statutory scheme and common law principles, defines the terms "parents" and "families." During the first half of Washington's statehood, determinations of the conflicting rights of persons in family relationships were made by courts acting in equity. But over the past half-century, our legislature has established statutory schemes intended to govern various aspects of parentage, child custody disputes, visitation privileges, and child support obligations. *See generally* ch. 26.26 RCW (parentage); ch. 26.09 RCW (responsibilities to children on dissolution of marriage); ch. 26.10 RCW (child custody and visitation); ch. 26.18 RCW (child support enforcement); ch. 74.20 RCW (support of dependent children); ch. 74.20A RCW (same). Yet, inevitably, in the field of familial relations, factual scenarios arise, which even after a strict statutory analysis remain unresolved, leaving deserving parties without any appropriate remedy, often where demonstrated public policy is in favor of redress. *See, e.g., Kaur v. Chawla*, 11 Wn. App. 362, 364, 522 P.2d 1198 (1974) (holding statutory filiation procedures fail to address factual scenario and recognizing illegitimate

---

[4] During the pendency of our review, L.B.'s guardian ad litem (GAL) has apparently filed GAL reports in the trial court. Carvin and the GAL jointly moved to file these reports and corresponding court orders and to have them supplement the record and be considered on review. This motion was passed to the merits.

RAP 9.11 governs the admission of additional evidence on review. Carvin rightfully concedes that the GAL reports fail to meet the six criteria set forth under RAP 9.11 but asserts that we can and should waive this requirement in the interests of justice. However, the admission of new factual evidence is unnecessary for purposes of our review. The court here decides two purely legal issues neither of which is substantially furthered by waiving our rules to accept additional evidence. As such, we deny Carvin and the GAL's motion to file the GAL reports and trial court orders.

child has *common law* right to support from his or her putative father).

¶12 And so we turn to the question before us: whether our state's common law recognizes *de facto* parents and, if so, what rights and obligations accompany such recognition.[5] Specifically, we are asked to discern whether, in the absence of a statutory remedy, the equitable power of our courts in domestic matters permits a remedy *outside* of the statutory scheme or, conversely, whether our state's relevant statutes provide the exclusive means of obtaining parental rights and responsibilities. *Accord In re Custody of H.S.H.-K.*, 193 Wis. 2d 649, 667, 681-83, 533 N.W.2d 419 (1995).

A

Common Law Parentage

¶13 *Common Law*: Carvin asserts that, because she lacks an adequate remedy at law, equity and the common law should accord her standing as a *de facto* parent. *See* Corrected Suppl. Br. of Resp't at 9, 11-12. Britain objects to the recognition of a common law right, asserting that such considerations are properly the province of our legislature. Pet. for Review at 18-19.

■ ¶14 So long as it is consistent with Washington statutory law, Washington courts adopt and reform the common law.

The common law, so far as it is not inconsistent with the Constitution and laws of the United States, or of the state of

---

[5] While Carvin petitioned the trial court for a determination of parentage pursuant to the UPA, the trial court and Court of Appeals rejected that claim, and Carvin has not sought review of that decision here. The UPA undeniably provides a statutory, and the most common, avenue by which courts adjudicate a person a parent in this state. While the UPA made some strides to address changing avenues to parentage, *see, e.g.*, RCW 26.26.210-.260 (surrogate parenting); RCW 26.26.700-.740 (assisted reproduction), it inevitably did not contemplate nor address every conceivable family constellation and in this court the parties agree that our statutory parentage determinations, under the UPA, fail to directly address this dispute.

Washington nor incompatible with the institutions and condition of society in this state, shall be the rule of decision in all the courts of this state.

RCW 4.04.010. Early in our state's history, this court construed RCW 4.04.010 to mean that,

in the absence of governing statutory provisions, the courts will endeavor to administer justice according to the promptings of reason and common sense, which are the cardinal principles of the common law; but will not blindly follow the decisions of the English courts as to what is the common law without inquiry as to their reasoning and application to circumstances.

*Bernot v. Morrison*, 81 Wash. 538, 544, 143 P. 104 (1914) (citing *Sayward v. Carlson*, 1 Wash. 29, 23 P. 830 (1890)). Washington courts have also construed this statute to permit the adaptation of the common law to address *gaps* in *existing* statutory enactments, providing that the common law may serve to "fill interstices that legislative enactments do not cover." *Dep't of Soc. & Health Servs. v. State Pers. Bd.*, 61 Wn. App. 778, 783-84, 812 P.2d 500 (1991) (citing RCW 4.04.010), *cited with approval in Clark County Pub. Util. Dist. No. 1 v. Int'l Bhd. of Elec. Workers, Local 125*, 150 Wn.2d 237, 245, 76 P.3d 248 (2003).

¶15 Washington courts have consistently invoked their equity powers and common law responsibility to respond to the needs of children and families in the face of changing realities. We have often done so in spite of legislative enactments that may have spoken to the area of law, but did so incompletely.[6] With these common law principles in mind, we turn to whether Washington's common law recognizes *de facto* parents.

---

[6] Washington courts have often used their equitable powers within the province of familial relationships and expanded the common law accordingly to address the changing needs of families. *See, e.g., Connell v. Francisco*, 127 Wn.2d 339, 348-50, 898 P.2d 831 (1995) (crafting standards for division of property on termination of common law meretricious relationship); *Ueland v. Pengo Hydra-Pull Corp.*, 103 Wn.2d 131, 136, 140, 691 P.2d 190 (1984) (noting that "[w]hen justice requires, this court does not hesitate to expand the common law and recognize a cause of action" and thus recognizing a child's independent cause of action for loss of parental consortium when a parent is negligently injured by another); *In re Marriage of Lindsey*, 101 Wn.2d 299, 304, 307, 678 P.2d 328 (1984) (recognizing

¶16 *Washington's Recognition of Common Law Parentage*: Carvin asks this court to affirm the Court of Appeals' holding recognizing a common law *de facto* parent status, asserting that the same is consistent with our jurisprudence and that severing such a parent-child relationship, regardless of its lack of statutory recognition, would be detrimental to the child. *See* Resp. to Pet. for Review at 7-8. Britain counters that because she is the biological mother of L.B. and there has been no finding that she is unfit, the law presumes she acts in the best interests of her child and the state should not interfere in her decisions, regardless of their impact on L.B. Pet. for Review at 11 (citing *Troxel*, 530 U.S. at 70). Further she contends that granting parental

meretricious relationship doctrine and instructing trial courts to make a " 'just and equitable' " distribution of property upon termination of such relationships (quoting *Latham v. Hennessey*, 87 Wn.2d 550, 554, 554 P.2d 1057 (1976))); *Lundgren v. Whitney's, Inc.*, 94 Wn.2d 91, 96, 614 P.2d 1272 (1980) (creating a cause of action for loss of consortium for wives whose husbands are injured by negligent acts of another); *State v. Douty*, 92 Wn.2d 930, 933-34, 603 P.2d 373 (1979) (holding that paternity may be determined on behalf of child born out of wedlock *regardless* of state statute failing to grant child standing); *Childers v. Childers*, 89 Wn.2d 592, 601-02, 575 P.2d 201 (1978) (noting accepted notion that there "exists [a] long standing special power[ ] [of] the courts . . . (*in equity, regardless of legislation*) over the children of broken homes to assure that their disadvantages are minimized" (emphasis added)); *Poole v. Schrichte*, 39 Wn.2d 558, 569, 236 P.2d 1044 (1951) ("authority . . . of the court to divide the property accumulated during . . . a [meretricious] relationship is in consequence of the *court's inherent equity power*, and *not* because of the divorce statute" (emphasis added)); *Van Tinker v. Van Tinker*, 38 Wn.2d 390, 391, 229 P.2d 333 (1951) (recognizing a legitimate child's common law right to support from his or her parents that may extend past the age of majority); *Buckley v. Buckley*, 50 Wash. 213, 218-19, 96 P. 1079 (1908) (*independent of divorce statute*, court relies on its "equity power" to permit a woman who in good faith entered into an invalid marriage to seek redress from husband); *Arey v. Arey*, 22 Wash. 261, 265-67, 60 P. 724 (1900) (finding "*de facto* marriage" existed and permitting cause of action for suit money and alimony on annulment of marriage despite statutory scheme that allowed such recovery only in action for divorce); *Kimble v. Kimble*, 17 Wash. 75, 79-84, 49 P. 216 (1897) (while common law, at the time, permitted alimony only incident to divorce, and statutes similarly provided, holding that "principles of equity and reason" justify reforming common law to permit cause of action for spousal maintenance in case of abandoned wife—holding statutory scheme addresses issue incompletely and as such does not preempt the field); *see also Higgins v. Intex Recreation Corp.*, 123 Wn. App. 821, 838-40, 99 P.3d 421 (2004) (extending parental consortium action to include stepchild's claim in the absence of statutory authority); *Gormley v. Robertson*, 120 Wn. App. 31, 38, 83 P.3d 1042 (2004) (extending meretricious relationship doctrine to same-sex couples); *Kaur*, 11 Wn. App. at 364 (holding statutory filiation procedures nonexclusive and that illegitimate child has *common law* right to support from his or her putative father).

status to " 'psychological parents' " would have "wide reaching implications" opening the door to claims by "teachers, nannies, parents of best friends, . . . adult siblings, aunts, [ ] grandparents," and every "third-party . . . caregiver." *Id.* at 12, 15.

■ ¶17 Washington courts have long recognized that individuals not biologically nor legally related to the children whom they "parent" may nevertheless be considered a child's "psychological parent."[7] *See, e.g., In re Welfare of*

---

[7] Our cases, and cases from other jurisdictions, interchangeably and inconsistently apply the related yet distinct terms of *in loco parentis*, psychological parent, and *de facto* parent. Reflecting this confusion, Carvin has sought recognition of her status as a *de facto or* psychological parent. Opening Br. of Appellant at 1. For purposes of our review, we adopt the following general definitions:

*In loco parentis*: Latin for " 'in the place of a parent,' " this term is temporary by definition and ceases on withdrawal of consent by the legal parent or parents. BLACK'S LAW DICTIONARY 803 (8th ed. 2004). While some legal responsibility often attaches to such a relationship, Washington courts and statutes have never considered the same actual parents or akin to actual parents. *See In re Custody of Brown*, 153 Wn.2d 646, 652, 105 P.3d 991 (2005) (noting "no Washington case recognizes that nonparents are guaranteed the fundamental rights of parents under the doctrine of in loco parentis"). In *Brown*, we did not have an opportunity to consider petitioner Gail Luby's *de facto* parent argument. *Id.* at 651 n.3. Under RAP 13.7(b), we generally do not consider new issues raised after review is granted in a case, and Luby's *de facto* parent argument was untimely. Thus, while the dissent correctly notes that Luby presented the argument in her supplemental brief, this court did not address it.

*Psychological parent*: Psychological parent is a term created primarily by social scientists but commonly used in legal opinions and commentaries to describe a parent-like relationship which is "based . . . on [the] day-to-day interaction, companionship, and shared experiences" of the child and adult. JOSEPH GOLDSTEIN, ANNA FREUD, ALBERT J. SOLNIT, BEYOND THE BEST INTERESTS OF THE CHILD 19 (1973). As such, it may define a biological parent, stepparent, or other person unrelated to the child. *See also* BLACK'S, *supra*, at 1145 ("A person who, on a continuing and regular basis, provides for a child's emotional and physical needs."). In Washington, psychological parents may have claims and standing above other third parties, but those interests typically yield in the face of the rights and interests of a child's legal parents. *See, e.g., In re Dependency of J.H.*, 117 Wn.2d 460, 469, 815 P.2d 1380 (1991). In *J.H.*, in the context of foster families, we reaffirmed that the "law recognizes the importance of the psychological parent to the child" but found that because the very nature of a foster placement is "temporary, transitional and for the purpose of supporting reunification with the legal parents" the law does not "establish a *right* on the part of a foster parent" to continue the relationship. *Id.* at 469. Courts have, nevertheless, recognized and relied on a person's characterization as a "psychological parent" in supporting their decisions. *Id.*

*De facto parent*: Literally meaning "parent in fact," it is juxtaposed with a legally recognized parent. BLACK'S, *supra*, at 448 (defining *de facto* as "[a]ctual; existing in fact; having effect even though not formally or legally recognized"). We are asked in this case to define the parameters of this term and in doing so, find

*Aschauer*, 93 Wn.2d 689, 697 n.5, 611 P.2d 1245 (1980); *see also In re Custody of Dombrowski*, 41 Wn. App. 753, 756-57, 705 P.2d 1218 (1985) (describing apparent father, whose presumption of paternity was rebutted by blood test, as, nevertheless, "the only father [the child] has ever known"). Yet Carvin's claim here seeks more than a simple recognition of her status as a psychological parent—she seeks standing as a *de facto* parent.

¶18 Two Court of Appeals cases support Carvin's claim that Washington's common law recognizes the status of *de facto* parents. Implicitly recognizing *de facto* parentage status, these courts have awarded custody to nonbiological "parents" over the objection of otherwise fit biological parents. In *In re Marriage of Allen*, 28 Wn. App. 637, 626 P.2d 16 (1981), noting that "unique circumstances may warrant unique custody decrees," *id*. at 639, Division Three affirmed a trial court's custody decree in favor of a deaf child's stepmother over the objection of the child's biological father. The stepmother parented the child from age three to age seven, and during that time, due in large part to the stepmother's "dedication, devotion and determination," the child showed "remarkable development." *Id*. at 641-42. The court recognized that, in custody disputes between parents and nonparents, "[g]reat deference is accorded to parental rights" yet those rights are "balanced by the State's interest as parens patriae in the child's welfare." *Id*. at 646. When these interests come into conflict, the parent's rights may be outweighed. *Id*. (citing *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980)). The court then found that parental unfitness *or* a determination that "the child's growth and development would be detrimentally affected by placement with an otherwise fit parent" could serve to outweigh parental rights. *Id*. at 646-47. The Court of Appeals then made two findings: one, that despite the father's fitness as a parent, the child's development would be detrimentally affected if his father was awarded custody,

that it describes an individual who, in all respects functions as a child's actual parent, meeting the criteria suggested herein. *See infra* pp. 709-10.

and two, that the child "had become integrated into the family unit" formed by the father and stepmother. *Id.* at 647-48. With regard to the second finding, it noted:

> Where the reason for deferring to parental rights—the goal of preserving families—would be ill-served by maintaining parental custody, as where a child is integrated into the nonparent's family, the *de facto* family relationship does not exist as to the natural parent and need not be supported. In such a case, custody might lie with a nonparent.

*Id.* at 648 (emphasis added) (footnote omitted). The court concluded that "the psychological relationship [here] is *equivalent* to that of a natural family entity." *Id.* (emphasis added).

¶19 Division One reached a similar conclusion in *In re Custody of Stell*, 56 Wn. App. 356, 369, 783 P.2d 615 (1989). There, the child referred to his aunt as " 'Mom' " and expert testimony established that she had become his "psychological parent." *Id.* at 359. Testimony also showed that because of the child's "special need for stability and consistent parenting," placement with the father "would be detrimental." *Id.* at 361, 368. The Court of Appeals additionally found that the record reflected that the aunt was the "psychological parent" of the child, that the two "represent a family unit," and that "these considerations cannot be ignored." *Id.* at 369. The Court of Appeals thus reversed the trial court's award of permanent custody to the child's father. *Id.* at 371.

¶20 The cases of *Allen* and *Stell* support the proposition that Washington common law recognizes the significance of parent-child relationships that may otherwise lack statutory recognition.[8] In addition, both cases make clear that individuals may comprise a legally cognizable family through means other than biological or adoptive.

---

[8] Interestingly, in 1926, this court, in a two paragraph opinion, affirmed a trial court's refusal of a biological father's writ of habeas corpus to recover custody of his daughter who had been in the custody of the child's aunt for eight years. *In re Application of Allen*, 139 Wash. 130, 130-31, 245 P. 919 (1926) (noting that "[t]his is a typical case wherein, notwithstanding the original and primary right of a parent, the great and leading object to be obtained is the welfare of the child").

B

## Legislative Pronouncements on Parentage

■ ¶21 Our legislature has been conspicuously silent when it comes to the rights of children like L.B., who are born into nontraditional families, including any interests they may have in maintaining their relationships with the members of the family unit in which they are raised.[9] In assessing whether our common law may recognize such relationships as well as the extent of the rights accorded *de facto* parents,[10] if any, we consider the relevant legislative enactments concerning parentage, child custody, and visitation, for two critical purposes: (1) to discern legislative pronouncements of our state's public policy and (2) to determine whether there exists a clear legislative intent to

---

[9] This statutory silence regarding the interests of children begotten by artificial insemination, and the rights and responsibilities of adults in such parenting arrangements, is not unique to Washington. *See* Gaia Bernstein, *The Socio-Legal Acceptance of New Technologies: A Close Look at Artificial Insemination,* 77 WASH. L. REV. 1035, 1036-37 (2002) (despite a long process of legalization and legitimization, the technology of artificial insemination, and the prevailing concept of socio-legal institute of family remains incompatible, leaving many legal issues largely unresolved and indeterminate).

The dissent believes the Washington legislature's silence on the question before us today is purposeful, based on language in *State ex rel. D.R.M. v. Wood,* 109 Wn. App. 182, 34 P.3d 887 (2001). But *D.R.M.* is factually and legally dissimilar from the case before us today. In *D.R.M.,* the Court of Appeals declined to impose a child support obligation on a former same-sex partner, Tracy Wood. Wood and her former partner separated before either learned of the pregnancy and did not reconcile upon news of the pregnancy. Consequently, Wood had a far less developed relationship with the child in question than Carvin did or does with L.B. Thus, the *D.R.M.* court's reluctance to impose a support obligation on Wood in the absence of statutory mandate was motivated by Wood's status as an intended parent, one who had not actualized any sort of parental relationship—natural, adoptive, *de facto,* or otherwise. *Id.* at 194-95. A discussion of the rights and responsibilities of an intended parent is not analogous to a discussion of one claiming to be an actual parent, as Carvin does.

[10] While the legal and social interests of children and parents are often interrelated, much of our statutory scheme remains distinctively adult-centric—and as the litigation here was brought, and principally furthered, by the involved adults, much of our discussion necessarily centers on the interests, rights, and responsibilities of the litigant adults. Nevertheless, as established by our legislature, "the best interests of the child" pervades our judicial consciousness in this field.

preempt the establishment of any common law rights in this context.[11]

¶22 *Uniform Parentage Act*: In 2002, Washington adopted the then-current version of the UPA to govern statutory determinations of parentage in our state. *See* LAWS OF 2002, ch. 302, *codified at* ch. 26.26 RCW.[12] Several sections of the UPA shed light on our state's public policy concerning disputes which touch on the rights and interests of children. Specifically, the legislature established that questions of parentage are to be considered without differentiation on the basis of the marital status or gender of the child's parent. *See* RCW 26.26.106 (prohibiting discrimination on basis of marital status and ensuring equivalent rights of children born outside the context of wedlock to those born within it); RCW 26.26.051 ("provisions relating to determination of paternity may be applied to a determination of maternity"). Additionally, the UPA establishes that at least in the case of artificial insemination, the intent of the parties is the principal inquiry in determining legal parentage. *See generally* RCW 26.26.700-.740 (emphasizing spousal consent).[13] While not directly controlling here, these related policy pronouncements inform our decision making regarding recognition of a common law right to *de facto* parentage.

¶23 In defining the scope of the act, the UPA provides that "[t]his chapter governs every determination of parent-

---

[11] Whether a statutory enactment acts to preempt or diminish common law rights is determined by legislative intent, *see cf. Roberts v. Dudley*, 140 Wn.2d 58, 71-73, 72 n.11, 993 P.2d 901 (2000), and "it must not be presumed that the legislature intended to make any innovation on the common law without clearly manifesting such intent." *Green Mountain Sch. Dist. No. 103 v. Durkee*, 56 Wn.2d 154, 161, 351 P.2d 525 (1960).

[12] As noted above, the parties here do not contend that Carvin has standing under the UPA.

[13] *See also* Lainie M.C. Dillon, Notes and Comments, *Conundrums with Penumbras: The Right to Privacy Encompasses Non-Gamete Providers Who Create Preembryos With the Intent to Become Parents*, 78 WASH. L. REV. 625, 641-42 (2003) ("The UPA declares that in the context of assisted reproduction, intent, not biology, is determinative of one's legal status as a parent.").

age in this state." RCW 26.26.021(1).[14] Nevertheless, while attempting to give structure and predictability to such determinations, neither the UPA nor corresponding statutes defining parental rights and responsibilities purport to preclude the operation of the common law when addressing situations left unanswered after conducting a strict statutory inquiry.[15] *Cf. Dep't of Soc. & Health Servs.*, 61 Wn. App. at 783-84. It is important to note that it is the interrelated nature of the UPA and other relevant statutory enactments and common law principles which give the UPA meaning. Thus, a close examination of these related statutes[16] is necessary to determine whether the legislature intended the UPA and the related statutes to be the *exclusive* means of obtaining parental rights and enforcing parental responsibilities, and also serve the parallel purpose of discerning the extent of any such rights cognizable by the common law.[17]

¶24 *Child Custody*: A study of Washington's common law confirms that, particularly in disputes touching on the

---

[14] None of the parties or amicus addresses the effect of RCW 26.26.021(1) in this context, that is, whether it operates to preclude common law determinations of parentage.

[15] The current statutory formation is wrought with "unavoidable tension in the law's objectives and . . . design." AM. LAW INST., PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION: ANALYSIS AND RECOMMENDATIONS 1-4 (2002) [hereinafter ALI PRINCIPLES] (noting conflicting goals of "[p]redictability vs. individualized decisionmaking," "[f]inality vs. flexibility," and "[j]udicial supervision vs. private ordering" (emphasis omitted)).

[16] *See Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 10-12, 43 P.3d 4 (2002) (legislative intent is derived from the language used in the statute and related statutes).

[17] *Cf. Connell*, 127 Wn.2d at 348-50. In *Connell* we recognized that common law and equitable principles permit a division of property upon termination of a meretricious relationship in spite of the quintessential nonmarital nature of the relationship and in the face of statutes that contemplate such property division only on dissolution of a marriage. *Id.* at 348-50, 352 (holding that "property that would have been characterized as community property had the couple been married is before the trial court for a just and equitable distribution"). In so holding, we drew on the policy pronouncements evident in the statute despite our recognition of the "explicit intent of the Legislature that RCW 26.09.080 apply to property distributions following a marriage." *Id.* at 350. In sum, while noting that dissolution laws "do not directly apply" we nevertheless "look[ed] toward those laws for guidance." *Id.* at 349.

rights and protection of minors, Washington courts have historically exercised broad equitable powers in considering cases regarding the welfare of children; this is especially evident in early custody disputes. In this context, in defining the scope of our courts' authority, we have previously established that

the superior courts of this state are courts of general jurisdiction and have power to hear and determine all matters legal and equitable in all proceedings known to the common law, except in so far as those have been expressly denied; that the jurisdiction of a court of equity over the persons, as well as the property, of infants has long been recognized; and that the right of the state to exercise guardianship over a child does not depend on a statute asserting that power.

*In re Welfare of Hudson*, 13 Wn.2d 673, 697-98, 126 P.2d 765 (1942); *see also State ex rel. Burrows v. Superior Court*, 43 Wash. 225, 228, 86 P. 632 (1906) (Washington trial courts are "court[s] of general equity jurisdiction" with "all the powers of the English chancery court." (citing CONST. art. IV, § 6)).

¶25 Prior to any statutory governance, Washington courts relied solely on their equity jurisdiction to determine custody disputes affecting children. *See, e.g., Borenback v. Borenback*, 34 Wn.2d 172, 178-79, 208 P.2d 635 (1949). In *Borenback*, absent a controlling statute, this court addressed a dispute of a minor's custody based on the "paramount and controlling consideration [of] the welfare of the child." *Id.* at 178 (citing *Brookshire v. Brookshire*, 29 Wn.2d 783, 189 P.2d 636 (1948); *Allen v. Allen*, 28 Wn.2d 219, 182 P.2d 23 (1947); *Mitchell v. Mitchell*, 24 Wn.2d 701, 166 P.2d 938 (1946); *Lindblom v. Lindblom*, 22 Wn.2d 291, 155 P.2d 790 (1945); *Flagg v. Flagg*, 192 Wash. 679, 74 P.2d 189 (1937); *Wixson v. Wixson*, 172 Wash. 151, 19 P.2d 912 (1933)). The *Borenback* court additionally recognized that in such actions "the superior court has large power and discretion regarding the custody of minor children." *Id.* (citing *Aubry v. Aubry*, 26 Wn.2d 69, 173 P.2d 121 (1946); *Pardee v. Pardee*, 21 Wn.2d 25, 149 P.2d 522 (1944); *Eliason*

*v. Eliason*, 10 Wn.2d 719, 118 P.2d 170 (1941); *Peterson v. Peterson*, 164 Wash. 573, 3 P.2d 1007 (1931)). As this power was not statutorily granted, it necessarily follows that the "large power and discretion," *id.*, resting with the superior courts over such matters, arises out of common law jurisprudence. *See also Beezley v. Beezley*, 71 Wn.2d 382, 383, 427 P.2d 1015 (1967) (per curiam) (determinations regarding modification of visitation rights within the equitable judicial discretion of courts); *Klettke v. Klettke*, 48 Wn.2d 502, 506, 294 P.2d 938 (1956) ("trial courts are vested with broad judicial discretion in determining the matter of the custody of a minor child"); *Lundin v. Lundin*, 42 Wn.2d 186, 187, 254 P.2d 460 (1953) ("The court in the making of an award of custody of a minor child must do so in furtherance of its best welfare and necessarily is vested with a wide latitude of judicial discretion."); *Cooper v. Cooper*, 83 Wash. 85, 90, 145 P. 66 (1914) (noting trial courts may exercise equitable powers, *apart from statutory proceedings*, in modifying custody of children and citing numerous cases in support thereof).[18] In addition, this court has established the controlling interest behind such considerations, stating,

> [t]he principle that the welfare of the child is the paramount consideration has been recognized and followed by this court in many cases. The two principles, then, the welfare of the child and the right of the parent, must be considered together, the former being the more weighty.

*In re Application of Day*, 189 Wash. 368, 382, 65 P.2d 1049 (1937) (citations omitted). In sum, historically, with the

---

[18] It is well recognized, both in Washington and nationally, that child custody and visitation orders may be established by reliance on courts' equity powers and the common law. *See* 2 HOMER H. CLARK, JR., THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES § 20.3, at 484 (2d ed. 1987) (noting "equity has inherent power to award custody," and as such "custody awards may be made regardless of statutory language" provided jurisdiction exists); *see also id.* § 20.9, at 547 (same principles apply to modifications). This fact is exemplified in Washington, and elsewhere, by the historic availability of the common law writ of habeas corpus in child custody proceedings. *See, e.g., In re Application of Day*, 189 Wash. 368, 371, 65 P.2d 1049 (1937); *In re Application of Allen*, 139 Wash. at 130-31; *see also Atwood v. Atwood*, 229 Minn. 333, 336, 39 N.W.2d 103 (1949). In sum, the common law nature of custody awards cannot be disputed. *See also* 4 JOHN NORTON POMEROY, A TREATISE ON EQUITY JURISPRUDENCE §§ 1303-04, 1307 (Spencer W. Symons ed., 5th ed. 1941).

paramount considerations of the child properly at the center of such disputes, Washington courts have not hesitated to exercise their common law equitable powers to award custody of minor children, at times making such awards to persons not biologically related to the child, but who nevertheless have unequivocally "parented" them. *See In re Application of Allen*, 139 Wash. 130, 130-31, 245 P. 919 (1926); *In re Custody of Stell*, 56 Wn. App. at 369-71; *In re Marriage of Allen*, 28 Wn. App. at 647-48. Equally important, there is no indication, in its enactments on the subject, that our legislature intended to provide the sole means of obtaining child custody, and our state's jurisprudence strongly suggests the continued viability of common law custodial actions.

¶26 *Visitation*: The concept of visitation in Washington originated principally in the courts and has been developed by the judicial branch through the common law. Prior to 1973, visitation was often granted and enforced by the courts acting in equity despite lack of any apparent statutory authority to do so.[19] Although the legislature had previously addressed disputes concerning children, it had done so without addressing visitation rights. *See* former RCW 26.08.110 (1949) (providing statutory redress for the "custody, support and education of . . . minor children" but not visitation), *repealed by* LAWS OF 1973, 1st Ex. Sess., ch. 157, § 3.

¶27 In 1973, as part of the dissolution act of 1973 the legislature adopted a statutory presumption in favor of postdivorce parental visitation. *See* LAWS OF 1973, 1st Ex. Sess., ch. 157, § 24. Professor Luvern Rieke commented

---

[19] *See, e.g., Rivard v. Rivard*, 75 Wn.2d 415, 451 P.2d 677 (1969) (without citing any statutory authority, affirms trial court's grant of reasonable visitation to father); *Joslin v. Joslin*, 45 Wn.2d 357, 364, 274 P.2d 847 (1954) (again without relying on any apparent statutory authority or guidance, notes that "visitation rights [are] either granted or denied to the other parent" based on trial court's "discretion" regarding what "will serve the best interests of the children involved."); *Borenback*, 34 Wn.2d at 178 (relying on case law only, notes "large power and discretion" of superior court with regard to custody of minor children and sets forth that "privilege of visitation" should be determined according to "what is best for the welfare of the child").

that this enactment merely "continu[ed] the generous policy of prior Washington law concerning visitation by a noncustodial spouse." Luvern V. Rieke, *The Dissolution Act of 1973: From Status to Contract?*, 49 WASH. L. REV. 375, 410 (1974). Thus, Washington's visitation scheme can be seen as largely a codification of common law jurisprudence, with no evidence that the enactment of statutes governing visitation was designed to preempt the court's equitable jurisdiction over circumstances not within the statute's contemplation.

¶28 Additionally, recognizing the inherently disruptive nature of dissolutions,[20] our legislature has attempted to lessen the emotional and psychological trauma experienced by children whose parents separate. To this end, the legislature endeavored to create a system that "encourage[s] each parent to maintain a loving, stable, and nurturing relationship with the child." RCW 26.09.187(3)(a). The legislature's apparent intent behind Washington's current visitation statutes reveals a strong presumption in favor of parental involvement, fostering and protecting a child's significant relationships.

> The best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care. Further, the best interest of the child is ordinarily served when the existing pattern of interaction between a parent and child is altered only to the extent necessitated by the changed relationship of the parents or as required to protect the child from physical, mental, or emotional harm.

RCW 26.09.002. To effectuate this policy, the law presumes that parents not granted custody[21] are entitled to reasonable visitation rights. RCW 26.10.160(1).

---

[20] We recognize that this case does not involve a dissolution as contemplated by Washington statutes. However, these enactments reflect both the common law nature of the field of law and the legislature's primary focus on the interests of the child.

[21] Although we use the term "custody" in this opinion, we recognize the legislature has largely abandoned it in favor of defining relative levels of residency. *See generally* RCW 26.09.184.

¶29 Thus, the history of Washington's visitation law evinces its common law foundation, a lack of legislative intent to preempt the common law, and equally important, its emphasis on the interests of the children at the center of such familial situations.

■ ¶30 *Summary of Legislative Enactments*: A review of our state's jurisprudence in this area thus reveals the following: (1) our legislature's certain and unwavering emphasis on the "best interests of the child" and on a child-centered approach to resolving custody and visitation disputes; (2) the legislature's recent proclamation, supporting previous common law holdings, that the marital status of a child's parents shall have no bearing on the child's rights to a legally cognizable relationship with parents, *see* RCW 26.26.106; *Kaur*, 11 Wn. App. at 364; (3) our legislature's commitment to the principle that sex and gender roles do not serve as a proper basis for distinction between parenting parties, *see* RCW 26.26.051; Const. art. XXXI, § 1; and (4) the recognized and accepted role of the judicial branch of our government in resolving family law disputes, especially when the legislative enactments speak to an issue incompletely. *See supra* pp. 688-90. It is evident that the UPA, especially when considered in the broader context of Washington's familial statutory scheme, was intended to supplement and clarify parentage actions and not to supplant the common law equity powers of our trial courts with regard to parentage, visitation, child custody, and support.[22]

---

[22] While not contested here, it is evident that child support obligations, while now addressed by statutes, continue to be additionally addressed through the common law and its adaptations. *See, e.g., Kaur*, 11 Wn. App. at 368; *see also* RCW 26-.18.030; RCW 74.20A.010. *See also Rubano v. DiCenzo*, 759 A.2d 959, 976 (R.I. 2000) ("fact that [party] is not a biological parent does not necessarily relieve [him or] her of a potential legal obligation to support the child"). Relevant here, our state is especially concerned with the interests of children, whether those interests arise within or outside the confines of a marital relationship, and further, that such interests continue to be protected and redressed through statutory *and* common law actions. *Kaur*, 11 Wn. App. at 368; RCW 74.20A.010.

## C

### Recognition of Common Law *De Facto* Parentage

¶31 *Persuasive Authority for* De facto *Parents*: In recent years, numerous other jurisdictions have faced issues similar to those presented here, often in the face of a statutory scheme which failed to contemplate the scenario presented. As this remains a case of first impression in this state, a review of decisions of other jurisdictions is instructive. *See, e.g., Eggleston v. Pierce County*, 148 Wn.2d 760, 770, 64 P.3d 618 (2003).

¶32 In 1995, the Wisconsin Supreme Court was presented with a situation factually analogous to the one presented here. *See In re Custody of H.S.H.-K.*, 193 Wis. 2d at 659-63. In that case, two women "shared a close, committed relationship for more than ten years" and jointly decided to raise a child. *Id.* at 659-60. One partner was artificially inseminated with sperm from an anonymous donor, became pregnant, and in December 1988 a child was born. *Id.* at 660. The women gave the child names honoring the families of both partners, held themselves out to the public as a family unit, and actively coparented the child until their relationship ended in 1993. *Id.* at 660-61. Three months after the parties separated, the biological mother terminated her former partner's relationship with the child and filed a restraining order seeking to prohibit all contact. *Id.* at 661. In response, the biological mother's former partner filed a petition for visitation and custody. *Id.*

¶33 The Wisconsin Supreme Court determined that under the Wisconsin statutory scheme, the biological mother's former female partner lacked standing to petition for custody or visitation. *Id.* at 657-58. The relevant custody statute, WIS. STAT. § 767.24 (1991-1992), provided that a nonparent may petition for custody only if a parent is " 'unfit or unable to care for the child' " or other compelling reasons exist. *H.S.H.-K.*, 193 Wis. 2d at 664 (quoting *In re Interest of Z.J.H.*, 162 Wis. 2d 1002, 1009, 471 N.W.2d 202

(1991)). The former partner was unable to meet this standard and thus lacked standing. *Id.* at 665-66. In addition, the court rejected the former partner's statutory visitation claim because the court determined that the "legislature enacted the ch. 767 visitation statute with the dissolution of marriage in mind." *Id.* at 667. Because the parties' dispute did not arise in the context of dissolution of a marriage, a legal impossibility because of their lesbian relationship, statutory visitation was unavailable.

¶34 In spite of this determination, the court held that the legislature had not intended to preempt the equitable power of the court in domestic matters so as to preclude a remedy *outside* of the statutory scheme. *Id.* It then examined the history of that state's visitation law and the relevant legislative enactments to discern whether the statutory scheme was intended as the exclusive means of obtaining visitation rights and concluded that "[i]t is reasonable to infer that the legislature did not intend the visitation statutes to bar the courts from exercising their equitable power to order visitation in circumstances not included within the statutes but in conformity with the policy directions set forth in the statutes." *Id.* at 682-83, 693. The court thus concluded that courts have equitable power to hear a visitation petition if it finds that the nonparent has a "parent-like relationship with the child" and that "a significant triggering event justifies state intervention." *Id.* at 694 (requiring, as a threshold matter, that the legal parent substantially interfere with the petitioner's parent-like relationship and then setting forth the four-part test adopted by our Court of Appeals below).

¶35 Again, with facts substantially identical to those present here, in 1999, the Massachusetts Supreme Judicial Court recognized the viability of the common law *de facto* parent doctrine. *See E.N.O. v. L.M.M.*, 429 Mass. 824, 828-30, 711 N.E.2d 886, *cert. denied*, 528 U.S. 1005 (1999). There, the former partner of the biological mother sought temporary visitation with the child she had parented from birth until the child was over three years old. *Id.* at 825-26.

The court held that the "equity jurisdiction" of the probate and family court governed resolution of the issue in spite of a lack of statutory authority. *Id.* at 827. It then concluded that the "the best interests of the child require . . . the child's de facto parent[ ] be allowed . . . visitation with the child." *Id.* at 832. The court found significant the fact that the former lesbian partner "was intimately involved in the decision to bring the child into the world." *Id.* at 830. Additionally, *E.N.O.* noted that, contrary to cases where a third party nonparent seeks rights vis-à-vis a child, or even where a putative father seeks paternity rights, here the family unit deserving protection was the family unit consisting of the biological mother, the lesbian partner, and the child, *id.* at 833, and "[t]he child's interest in maintaining his filial ties with the plaintiff counters the [biological mother's] custodial interest." *Id.* The fact that "[t]he only *family* the child has ever known," *id.* (emphasis added), could be described as a nontraditional family unit, did not make its disruption any less significant to the child. As such, *E.N.O.*'s holding principally rested on its conclusion that "recognition of de facto parents is in accord with notions of the modern family," *id.* at 829, and it is the actual family unit that should ultimately be afforded respect and protected from unreasonable disruption.

¶36 Numerous other jurisdictions have recognized common law rights on behalf of *de facto* parents. *See, e.g.,* *C.E.W. v. D.E.W.,* 2004 ME 43, 845 A.2d 1146, 1151-52 (recognizing *de facto* parents and placing them in parity with statutory parents); *In re Bonfield,* 97 Ohio St. 3d 387, 2002-Ohio-6660, 780 N.E.2d 241 (finding that because state statute specifically defined " 'parent,' " court found it "inappropriate to . . . broaden the narrow class of persons" to include biological mother's same-sex partner and thus partner was "not entitled to the benefit of statutes that are clearly inapplicable to such a familial arrangement," *but* concluding courts do have jurisdiction to consider petition for shared custody as not preempted by statute); *T.B. v. L.R.M.,* 567 Pa. 222, 234, 786 A.2d 913 (2001) (concluding

lesbian partner "assumed a parental status and discharged parental duties with the consent of [the biological mother]" and thus has standing as person *in loco parentis* to bring action for partial custody and visitation); *V.C. v. M.J.B.*, 163 N.J. 200, 227-28, 748 A.2d 539 (holding *de facto* parent "stands in parity with the legal parent" but "legal parent's status is a significant weight in the best interests balance" and with "[v]isitation . . . the presumptive rule"), *cert. denied*, 531 U.S. 926 (2000); *Rubano v. DiCenzo*, 759 A.2d 959, 975-76 (R.I. 2000) (finding no "infer[ence] [of] legislative intent to preclude standing to a de facto parent" concludes that "a person who has no biological connection to a child but who has served as a psychological or de facto parent to that child may . . . establish his or her entitlement to parental rights vis-à-vis the child"); *see also In re Parentage of A.B.*, 818 N.E.2d 126, 131-33 (Ind. Ct. App. 2004) (holding common law permits recognition of former same-sex partner of biological mother as legal coparent of child conceived by artificial insemination during relationship); *In re Interest of E.L.M.C.*, 100 P.3d 546, 558-61 (Colo. Ct. App. 2004) (finding a compelling state interest in preventing harm to child satisfies strict scrutiny analysis and affirming recognition of "psychological parent" doctrine in context of former same-sex partner's petition for equal parenting time), *cert. denied,* 2004 Colo. LEXIS 851 *and Clark v. McLeod*, 543 U.S. 1142 (2005); *A.C. v. C.B.*, 113 N.M. 581, 584-85, 829 P.2d 660 (Ct. App.) (recognizing same-sex dual parent relationship and reversing trial court's ruling that coparenting agreement unenforceable), *cert. denied*, 113 N.M. 449, 827 P.2d 837 (1992).[23] These cases provide a well

---

[23] *See also* ALI PRINCIPLES 128-30 (Reporter's Notes) (citing cases where courts have similarly held under a variety of equitable doctrines). While a majority of states that have addressed this issue have recognized some common law rights, there is a split of authority and some other jurisdictions have held that any potential common law rights of *de facto* parents are precluded by that particular state's relevant statutory scheme or constitution. *See, e.g., In re Nelson*, 149 N.H. 545, 548-49, 825 A.2d 501 (2003) (holding state constitution prohibits common law grant of custodial rights to an unrelated third person over the express objection of fit adoptive parent); *Titchenal v. Dexter*, 166 Vt. 373, 377-78, 693 A.2d 682 (1997) (declining to allow an adoptive parent's former same-sex partner third party visitation rights, holding that absent statutory authority legal parents retain the

reasoned and just template for the recognition of *de facto* parent status in Washington.[24]

■ ¶37 *Conclusion*: Our state's current statutory scheme reflects the unsurprising fact that statutes often fail to contemplate all potential scenarios which may arise in the ever changing and evolving notion of familial rela-

right to determine whether third party visitation is in their adopted child's best interest); *In re Thompson*, 11 S.W.3d 913, 923 (Tenn. Ct. App. 1999) (holding that "[a]bsent statutory authority establishing such a third-party's right to visitation, parents retain the right to determine with whom their children associate"); *Porter v. Overton*, 214 Mich. App. 95, 102, 542 N.W.2d 288 (1995) (per curiam) (former same-sex partner of deceased biological mother lacked standing under Michigan statutes to petition for custody); *Alison D. v. Virginia M.*, 77 N.Y.2d 651, 654-57, 572 N.E.2d 27, 569 N.Y.S.2d 586 (1991) (per curiam) ( *de facto* parents not parents according to state statutory scheme); *but see Karin T. v. Michael T.*, 484 N.Y.S.2d 780, 784, 127 Misc. 2d 14 (1985) (woman who held herself out as a man, obtained marriage license with other woman, and whose partner was subsequently artificially inseminated, deemed to have "brought forth [the] offspring as if done biologically," and thus "under the unique facts" of the case is a " 'parent' to whom such responsibility attaches" for purposes of imposing child support).

In addition, California recently reversed course and held, in three separate supreme court cases, that the UPA may grant and impose parental rights and responsibilities to women with regard to children born to their partners in a lesbian relationship. *See Elisa B. v. Superior Court*, 37 Cal. 4th 108, 117 P.3d 660, 666, 33 Cal. Rptr. 3d 46 (2005) ("perceiv[ing] no reason why both parents of a child cannot be women" the court held that the UPA presumes the partner to be a parent, and she should be responsible for child support obligations); *K.M. v. E.G.*, 37 Cal. 4th 130, 117 P.3d 673, 675, 33 Cal. Rptr. 3d 61 (2005) (in case where one woman provides her ova in order to impregnate her partner for the purpose of raising a child in their joint home, court holds that "when partners in a lesbian relationship decide to produce children in this manner, both the woman who provides her ova and her partner who bears the children are the children's parents"); *Kristine H. v. Lisa R.*, 37 Cal. 4th 156, 117 P.3d 690, 33 Cal. Rptr. 3d 81 (2005) (one partner in same-sex relationship estopped from attacking validity of stipulated judgment declaring both partners parents).

[24] In addition, the American Law Institute's recent recommendation supports the modern common law trend of recognizing the status of *de facto* parents. *See* ALI PRINCIPLES §§ 2.01-2.04, 2.18. The *ALI Principles* support the establishment of both "parent-by-estoppel" and "de facto parent." Relevant here, according to the ALI's recommendations, "parent-by-estoppel" would include an "[i]ndividual who is a co-parent since the child's birth, pursuant to a co-parenting agreement with the legal parent(s)." *Id.* § 2.03, at 114 (emphasis omitted) ("contemplat[ing] the situation of two cohabitating adults who undertake to raise a child together, with equal rights and responsibilities as parents"). Under slightly different standards than that which we adopt today, the principles support recognition of *de facto* parents. *Id.* § 2.03, at 107-08 (defining as individuals who lived with the child for not less than two years and with the agreement of a legal parent performed caretaking functions equal to or greater than the legal parent). Finally, *ALI Principles* then recommend an allocation of parental responsibilities to "parent[s] by estoppel" and "de facto parent[s]." *Id.* § 2.18, at 385.

tionships. Yet, simply because a statute fails to speak to a specific situation should not, and does not in our common law system, operate to preclude the availability of potential redress. This is especially true when the rights and interests of those least able to speak for themselves are concerned. We cannot read the legislature's pronouncements on this subject to preclude any potential redress to Carvin or L.B. In fact, to do so would be antagonistic to the clear legislative intent that permeates this field of law—to effectuate the best interests of the child in the face of differing notions of family and to provide certain and needed economical and psychological support and nurturing to the children of our state. While the legislature may eventually choose to enact differing standards than those recognized here today, and to do so would be within its province, until that time, it is the duty of this court to "endeavor to administer justice according to the promptings of reason and common sense." *Bernot*, 81 Wash. at 544.

¶38 Reason and common sense support recognizing the existence of *de facto* parents and according them the rights and responsibilities which attach to parents in this state. We adapt our common law today to fill the interstices that our current legislative enactment fails to cover in a manner consistent with our laws and stated legislative policy. As Justice Sandra Day O'Connor noted, "[t]he demographic changes of the past century make it difficult to speak of an average American family," *Troxel*, 530 U.S. at 63 (plurality opinion).

¶39 Recognition of a *de facto* parent is supported primarily by our legislature's pronouncements on the subject, our courts historic common law role with respect to visitation, child custody, and support obligations, and is further buttressed by the prior Court of Appeals cases of *In re Marriage of Allen* and *In re Custody of Stell* and the persuasive reasoning of out-of-state cases. As such, the common law grants Carvin standing to prove she is a *de facto* parent and, if so determined, to petition for the corresponding rights and obligations of parenthood.

¶40 To establish standing as a *de facto* parent we adopt the following criteria, delineated by the Wisconsin Supreme Court and set forth in the Court of Appeals opinion below: "(1) the natural or legal parent consented to and fostered the parent-like relationship, (2) the petitioner and the child lived together in the same household, (3) the petitioner assumed obligations of parenthood without expectation of financial compensation, and (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature." *In re Parentage of L.B.*, 121 Wn. App. at 487. In addition, recognition of a *de facto* parent is "limited to those adults who have fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life." *C.E.W.*, 845 A.2d at 1152.

¶41 We thus hold that henceforth in Washington, a *de facto* parent stands in legal parity with an otherwise legal parent, whether biological, adoptive, or otherwise.[25] *Cf.* *C.E.W.*, 845 A.2d at 1151-52. As such, recognition of a person as a child's *de facto* parent necessarily "authorizes [a] court to consider an award of parental rights and responsibilities . . . based on its determination of the best interest of the child." *Id.* at 1152; *see* RCW 26.09.002.[26] A *de facto* parent is not entitled to any parental privileges, as a

---

[25] *Cf.* ALI PRINCIPLES § 2.03, at 107 (under *Principles'* formulation "a *parent* is either a legal parent, a parent by estoppel, or a de facto parent"). While not "legal parents," parents by estoppel and *de facto* parents provide exceptions to the traditional rule, allowing them to participate in custody and other disputes. *Id.* § 2.04, at 136 cmt. d; § 2.18.

[26] "The criteria for determining the best interests of the child are varied and highly dependent on the facts and circumstances of the case at hand. *Yet continuity of established relationships is a key consideration*." *McDaniels v. Carlson*, 108 Wn.2d 299, 312-13, 738 P.2d 254 (1987) (emphasis added) (citation omitted). Here, at the time this action was brought, both Britain and Carvin were individuals best described as within the confines of the appropriate family unit. The appropriateness of the "best interests" standard, even in the face of unpredictable and evolving notions, is revealed by the fact that it unequivocally establishes the child as the central focal point of the inquiry. *See* MARY LYNDON SHANLEY, MAKING BABIES, MAKING FAMILIES 135-36 (2001) ("The best interest standard directs attention not to adults' self-ownership, intent, or action, but to how best to provide a particular child with physical sustenance and psychological nurture.").

matter of right, but only as is determined to be in the best interests of the child at the center of any such dispute.

## D

### Fundamental Parental Liberty Interest

¶42 Britain asserts the recognition of Carvin as a *de facto* parent, and granting her rights akin to a biological or adoptive parent, violates Britain's constitutionality protected liberty interest to care for and control her child without unwarranted state intervention, in contravention of United States Supreme Court precedent. *See Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944). She notes that "the law presumes that biological parents are not only fit, but will act in the best interest of their children," Pet. for Review at 7 (citing *Troxel*, 530 U.S. at 68), and there is no indication that she is in anyway unfit as a parent. *See* CP at 312. Carvin counters that common law recognition of *de facto* parents does not implicate the constitutional infirmities recognized in *Troxel* and that the first of the four *de facto* parent standards, that the "natural or legal parent consented to and fostered the parent-like relationship," *see supra* p. 708, "incorporates the constitutionally requisite deference to the legal parent." Corrected Suppl. Br. of Resp't at 12-13. We agree with Carvin.[27]

¶43 It is well recognized that "[t]he liberty interest . . . of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court." *Troxel*, 530 U.S. at 65 (plurality opinion) (citing *Prince*, 321 U.S. at 166; *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35, 45 S. Ct. 571, 69 L. Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399, 401, 43 S. Ct. 625, 67 L. Ed. 1042 (1923)); *accord In re*

---

[27] Carvin and amicus in this case persuasively argue that Carvin and L.B., in addition to Britain, have constitutionally protected rights to maintain their parent-child relationship. *See* Amicus Br. of American Civil Liberties Union at 3-4. However, our resolution of the central issue here, granting *de facto* parental standing to Carvin, renders these additional constitutional concerns moot.

*Welfare of Sumey*, 94 Wn.2d at 762. Additionally, in *In re Custody of Smith*, this court applied a strict scrutiny analysis in discerning whether a grandparent's invocation of the visitation statute infringed on the biological parent's "fundamental 'liberty' interest." 137 Wn.2d at 15. In doing so, this court stated that "state interference is justified only if the state can show that it has a compelling interest and such interference is narrowly drawn to meet only the compelling state interest involved." *Id.*; *see also In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 57-58, 109 P.3d 405 (2005) (reaffirming *Smith*'s strict scrutiny analysis).

¶44 *C.A.M.A.* reaffirmed *Smith*'s holding establishing strict scrutiny analysis as the appropriate analytic framework in reviewing the State's infringement on a parent's fundamental liberty interest. However, like *Smith*, *C.A.M.A.* dealt with the competing interests of biological parents and *third parties*, in both cases grandparents. No case has ever applied a strict scrutiny analysis in cases weighing the competing interests of *two parents*. Rather, in Washington, courts attempt to discern the best interests of the child. Given the now equivalent parental positions of the parties, no heightened scrutiny is warranted.

¶45 Significantly, our holding today regarding the common law status of *de facto* parents renders the crux of Britain's constitutional arguments moot. Britain's primary argument is that the State, through judicial action, cannot infringe on or materially interfere with her rights as a biological parent in favor of Carvin's rights as a nonparent third party. However, today we hold that our common law recognizes the status of *de facto* parents and places them in parity with biological and adoptive parents in our state. Thus, if, on remand, Carvin can establish standing as a *de facto* parent, Britain and Carvin would *both* have a "fundamental liberty interest[ ]" in the "care, custody, and control" of L.B. *Troxel*, 530 U.S. at 65.

¶46 Additionally, contrary to Britain's assertions, *Troxel* does not establish that recognition of a *de facto* parentage right infringes on the liberty interests of a biological or

adoptive parent. First, *Troxel* did not address the issue of state law determinations of "parents" and "families," but rather simply disapproved of the grant of visitation in that case, narrowly holding that "[t]he problem . . . is not that the [trial court] intervened" but that, when it did so, "it gave no special weight at all" to the *parents'* determination regarding the *grandparents'* visitation. *Troxel*, 530 U.S. at 69. Second, addressing the issue of nontraditional families and disputes arising therefrom, Justice John Paul Stevens noted that:

> Even the Court would seem to agree that in many circumstances, it would be constitutionally permissible for a court to award some visitation of a child to a parent or previous caregiver in cases of parental separation or divorce, cases of disputed custody, cases involving temporary foster care or guardianship, and so forth.

*Id*. at 85 (Stevens, J., dissenting). *See also id*. at 100-01 (Kennedy, J., dissenting) ("a fit parent's right vis-à-vis a complete stranger is one thing; her right vis-à-vis another parent or a *de facto* parent may be another"); *id*. at 70 (plurality opinion) (listing and implicitly approving of other state's third party visitation statutes); *id*. at 93 (Scalia, J., dissenting) (taking issue with constitutional doctrine of "parental rights" in its entirety as not textually based, but noting *arguendo* that any such constitutional recognition necessarily requires "defined gradations of other persons (grandparents . . . long-term guardians, etc.) who may have some claim against the wishes of the parents"). Thus, *Troxel* does not imply any constitutional infirmity in our holding today, and importantly, nor does it place any constitutional limitations on the ability of states to legislatively, or through their common law, define a parent or family. Neither the United States Supreme Court nor this court has ever held that "family" or "parents" are terms limited in their definition by a strict biological prerequisite. *See generally* Nancy D. Polikoff, *The Impact of* Troxel v. Granville *on Lesbian and Gay Parents*, 32 RUTGERS L.J. 825 (2001); Barbara Bennett Woodhouse, *Hatching the Egg: A Child-*

*Centered Perspective on Parents' Rights*, 14 CARDOZO L. REV. 1747 (1993). Our common law recognition of another class of "parents" eradicates the parent/nonparent dichotomy that was the crux of both the *Smith* and *Troxel* opinions.

¶47 Finally, in contrast to Britain's fears that "teachers, nannies, parents of best friends, . . . adult siblings, aunts, [ ] grandparents," and every "third-party . . . caregiver" will now become *de facto* parents, Pet. for Review at 12, 15, attaining such recognition should be no easy task. Critical to our constitutional analysis here, a threshold requirement for the status of the *de facto* parent is a showing that the legal parent "consented to and fostered" the parent-child relationship. *See supra* p. 709. The State is not interfering on behalf of a third party in an insular family unit but is enforcing the rights and obligations of parenthood that attach to *de facto* parents; a status that can be achieved only through the active encouragement of the biological or adoptive parent by affirmatively establishing a family unit with the *de facto* parent and child or children that accompany the family.[28] In sum, we find that the rights and responsibilities which we recognize as attaching to *de facto* parents do not infringe on the fundamental liberty interests of the other legal parent in the family unit.

¶48 Finding no constitutional infirmities in recognizing *de facto* parents, we accordingly affirm the Court of Appeals on this issue and remand to the trial court for a determination of whether Carvin is L.B.'s *de facto* parent and any further appropriate proceedings in accord with this opinion.[29]

---

[28] As the Massachusetts Supreme Judicial Court has stated, "[t]he child's interest in maintaining his [or her] filial ties with the plaintiff counters the defendant's custodial interests." *E.N.O.*, 429 Mass. at 833 ("The family that must be accorded respect in this case is the family formed by the plaintiff, the defendant, and the child. The defendant's parental rights do not extend to the extinguishment of the child's relationship with the plaintiff."); *see also T.B.*, 567 Pa. at 233-34.

[29] Amicus in this case have argued that, like Britain and Carvin, L.B. also has constitutionally protected interests at stake in this case. Particularly relevant, amicus curiae the Justice for Children Project advocates on behalf of L.B. for appointment of independent counsel. Because no party to this dispute, Britain,

E

## Third Party Visitation

■ ¶49 Carvin alternatively sought third party visitation pursuant to RCW 26.10.160(3). Our decision today, holding that Carvin has standing to petition for a determination of *de facto* parentage, may render this alternative argument moot. However, if she is unsuccessful in her petition for *de facto* parentage, our recent decision in *In re Parentage of C.A.M.A* makes clear that Washington's current third party visitation statutes are unconstitutional and inoperative and thus unavailable as an alternative ground on which to seek visitation.

¶50 Carvin concedes that this court, in *In re Custody of Smith*, held that RCW 26.10.160 was facially unconstitutional. Corrected Suppl. Br. of Resp't at 20. However, Carvin asserts that the United States Supreme Court's review of *Smith* in *Troxel*, which held that section .160(3) was unconstitutional only as applied in that case, essentially resurrected the third party visitation statute. *Id.* at 20-22 (asserting that "*Troxel* makes clear that RCW 26.10.160(3) does not necessarily offend due process"). However, since she made this argument, this court issued *In re Parentage of C.A.M.A.,* which controls the result here.

Carvin, nor L.B., through her GAL, has raised or otherwise addressed this issue at any stage in the proceeding, we decline to consider the issue of whether appointment of counsel is in fact constitutionally mandated. *See* RAP 13.7(b). That being said, we strongly urge trial courts in this and similar cases to consider the interests of children in dependency, parentage, visitation, custody, and support proceedings, and whether appointing counsel, in addition to and separate from the appointment of a GAL, to act on their behalf and represent their interests would be appropriate and in the interests of justice. *Cf.* RCW 13.34.100(6); RCW 26.09.110; KING COUNTY LOCAL FAMILY LAW RULE 13. When adjudicating the "best interests of the child," we must in fact remain centrally focused on those whose interests with which we are concerned, recognizing that not only are they often the most vulnerable, but also powerless and voiceless. We, however, reserve for another day the underlying question raised by amicus of whether the United States Constitution or the Washington Constitution mandates appointment of counsel in a given circumstance. *But see Kenny A. ex rel. Winn v. Perdue*, 356 F. Supp. 2d 1353, 1359-61 (N.D. Ga. 2005) (holding children have fundamental liberty interest in deprivation proceedings and due process requires appointment of independent counsel to represent child's interests).

¶51 At issue in *C.A.M.A.* was the constitutionality of the visitation provided under RCW 26.09.240, which we held facially unconstitutional in violation of *Smith*. In doing so, the court reaffirmed the holding in *Smith*.

> *Smith* required that a grandparent (or other third party seeking visitation) must show that denial of visitation would result in harm to the child before a court could order visitation over the objections of a fit parent. "It is not within the province of the state to make significant decisions concerning the custody of children merely because it could make a 'better' decision [than the parent]."

*C.A.M.A.*, 154 Wn.2d at 61 (alteration in original) (quoting *Smith*, 137 Wn.2d at 20). In *C.A.M.A.*, this court struck RCW 26.09.240 in its entirety. This court held that in order to comply with the *Smith* requirement that harm to the child must be demonstrated to order visitation over the objection of a fit parent, courts would be required to apply a " 'harm to the child' standard" as opposed to or in addition to the current "best interests of the child" standard. *C.A.M.A.*, 154 Wn.2d at 68. Because we concluded in *Smith* that "we will not read qualifications into [a] statute which are not there," 137 Wn.2d at 12, we invalidated RCW 26-.09.240 in its entirety. *C.A.M.A.*, 154 Wn.2d at 69.

¶52 In applying RCW 26.10.160(3), the Court of Appeals in this case discussed only the *Troxel* case and performed no analysis of this court's holding in *Smith*. While simply following *Troxel*'s narrower holding, *Smith*'s invalidation may have been debatable, following this court's holding in *C.A.M.A.*, it is clear that Washington's third party visitation statutes, RCW 26.09.240 and RCW 26.10.160(3), are facially unconstitutional. The effect of holding a statute facially unconstitutional "is to render the statute totally inoperative." *City of Redmond v. Moore*, 151 Wn.2d 664, 669, 91 P.3d 875 (2004). As such, based on our holdings in *Smith* and *C.A.M.A.*, until the legislature amends the relevant statutes, there exists no statutory right to third

party visitation in Washington. Accordingly, we reverse the Court of Appeals on this issue.

## III

### Conclusion

¶53 We affirm in part and reverse in part the Court of Appeals and remand this case to the superior court for further proceedings consistent with this opinion.

ALEXANDER, C.J., and C. JOHNSON, MADSEN, CHAMBERS, OWENS, and FAIRHURST, JJ., concur.

¶54 J.M. JOHNSON, J. (dissenting) — I disagree with the majority's resolution of this case and am saddened by the impact caused by this judicial rewrite of our parentage laws on this child—poor little L.B. At the outset, I note that the sexual orientation history of the parties in this case should be irrelevant under the straightforward analysis the statute and constitution require.[30] Regardless of the various sexual orientation claims, the outcome must be that a mother has a fundamental right to make decisions for her child. The Washington Uniform Parentage Act (UPA), chapter 26.26 RCW, requires the same analysis and conclusion as do the state and federal constitutions: L.B.'s mother, Page Britain, is fit (no contrary allegation has been made), and therefore the courts must presume that she acts in her child's best interests.

¶55 Under the majority's holding, the parties in this case will return to the trial court for a determination of whether Sue Ellen ("Mian") Carvin, the claimant, is a *"de facto"* parent—even though she is not a parent under any reading

---

[30] I note this because the Court of Appeals' decision is wrought with references to sexual orientation of mother, father, and claimant that are irrelevant and only serve to obfuscate the determinative issue: *who is the child's mother? See In re Parentage of L.B.*, 121 Wn. App. 460, 89 P.3d 271 (2004).

of our constitution or statute.[31] If or when the court below decides she is a *"de facto"* parent, Carvin will magically obtain the fundamental rights of a parent—rights equal to those of L.B.'s biological and legal mother, Britain. Unfortunately, the court will then likely divide custody on some unspecified basis.

¶56 This outcome is unconstitutional and in derogation of rights of the mother because it interferes with an admittedly fit parent's fundamental right to make child rearing decisions. *See Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000); *see also In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 109 P.3d 405 (2005); *In re Custody of Smith*, 137 Wn.2d 1, 969 P.2d 21 (1998).

¶57 It will be shown below that this *"de facto"* claimant meets *none* of the qualifications of a parent under the UPA. Further indicative of Carvin's motives here, her counsel admitted at argument that Carvin has not contributed to L.B.'s support since this litigation began. Wash. State Supreme Court 17:34, 18:32 (Feb. 15, 2005), *audio recording by* TVW, Washington State's Public Affairs Network, *available at* http://www.tvw.org. Instead of helping support L.B., she has chosen to engage in protracted litigation that is costly, financially and emotionally—undoubtedly causing agonizing stress on little L.B., who has become a battleground for this interpersonal and political debate.[32]

¶58 The majority purports to dispose of the constitutional issue raised in *Troxel* and *Smith* by waving a magic wand and creating *"de facto"* parents: "[o]ur common law recognition of another class of 'parents' eradicates the parent/nonparent dichotomy that was the crux of both the *Smith* and *Troxel* opinions." Majority at 712. However, it is

---

[31] The father, John Auseth, later married Britain, signed an acknowledgment of paternity, and added his name to L.B.'s birth certificate. Clerk's Papers at 198. The Court of Appeals remanded the case and directed the trial court to determine whether the father is a necessary party. It seems obvious the father would be a necessary party as Carvin's action also intrudes on his rights. The majority's disposition of this problem is unclear.

[32] The litigation costs, including those of six separate amici, would be better placed in trust for little L.B., who will no doubt sorely need such help later in life.

this court's creation of this new class of parents that is the constitutional violation (and the court has no power to "eradicate the parent/nonparent dichotomy" which has existed as long as there have been families). In this case there is a real, fit, actual, biological parent whose fundamental interest in the care, custody, and raising of her child is infringed by the majority's elevating of a nonparent to *"de facto"* parental status.

¶59 This is a constitutional matter. The United States Supreme Court found in *Troxel* that the Washington trial court had erred when it failed to apply the constitutionally *required* presumption that a fit parent acts in the child's best interests (and thus failed to require proof that the parent was unfit before making a custody determination against the parent's wishes). *Troxel*, 530 U.S. at 68-69. Moreover, the *Troxel* trial court presumption, reflecting Washington's nonparental visitation statute then in effect, failed to protect the mother's fundamental constitutional right to make decisions concerning the rearing of her own daughter.[33] *Id.* at 70. (The *Troxel* decision also predicts the fate of the majority's *"de facto"* parent ruling when reviewed by that court.)

¶60 Here, the majority errs, as the Washington statute and trial court did in *Troxel*, by allowing a court to assume that it is in a child's interests to continue a relationship with a nonparent over objection of the legitimate parent. Second, the majority's ruling fails to provide any protection for Britain's fundamental constitutional right as a fit mother to make decisions concerning the upbringing of her own daughter.

¶61 Worse, in my view, the majority here looks beyond a detailed and complete statutory scheme adopted by the Washington legislature and creates by judicial decree a new method for determining parentage. The UPA, adopted by many states, is avowedly intended to provide the exclusive remedy for determining parentage as it "governs every

---

[33] Similarly, the subsequently adopted "grandparents visitation statute" was held unconstitutional in *In re Parentage of C.A.M.A.*, 154 Wn.2d 52.

determination of parentage in this state." RCW 26-.26.021(1).

¶62 An unambiguous statute is not subject to judicial construction. *Wash. State Coalition for the Homeless v. Dep't of Soc. & Health Servs.*, 133 Wn.2d 894, 904, 949 P.2d 1291 (1997). Instead, a court must ascertain and give effect to the intent and purpose of the legislature. *Id.* Additionally, separation of powers requires a court to resist the temptation to rewrite an unambiguous statute to suit its notions of public policy and to recognize that " 'the drafting of a statute is a legislative, not a judicial, function.' " *State v. Jackson*, 137 Wn.2d 712, 725, 976 P.2d 1229 (1999) (quoting *State v. Enloe*, 47 Wn. App. 165, 170, 734 P.2d 520 (1987)).

¶63 Here, the UPA unambiguously defines a "parent." A parent is "an individual who has established a parent-child relationship under RCW 26.26.101." RCW 26.26.011(12). A mother-child relationship is established in five situations: (1) when a woman gives birth to a child, (2) through an adjudication of maternity, (3) through adoption, (4) by a surrogate parentage contract, or (5) by an affidavit and physician's certificate stating a person's intent to be bound as a parent of a child born through alternative reproductive medical technology. RCW 26.26.101.[34]

---

[34] "(1) The mother-child relationship is established between a child and a woman by:

"(a) The woman's having given birth to the child, except as otherwise provided in RCW 26.26.210 through 26.26.260;

"(b) An adjudication of the woman's maternity;

"(c) Adoption of the child by the woman;

"(d) A valid surrogate parentage contract, under which the mother is an intended parent of the child, as provided in RCW 26.26.210 through 26.26.260; or

"(e) An affidavit and physician's certificate in a form prescribed by the department of health wherein the donor of ovum or surrogate gestation carrier sets forth her intent to be legally bound as the parent of a child or children born through alternative reproductive medical technology by filing the affidavit and physician's certificate with the registrar of vital statistics within ten days after the date of the child's birth pursuant to RCW 26.26.735.

"(2) The father-child relationship is established between a child and a man by:

"(a) An unrebutted presumption of the man's paternity of the child under RCW 26.26.116;

¶64 Britain qualifies under RCW 26.26.101(1)(a)—incorporating the preexisting definition of parent—as she is the birth mother of L.B.[35] Carvin does not qualify under any section.[36] This should end the analysis.

¶65 The statute does contemplate various other ways in which a person may establish a true parent relationship. Absent from these definitions of parent, which the legislature intended as exclusive, is any mention of a *"de facto"* parent or any provision that Carvin fits.

¶66 The statute's extensive detail and forethought is evidence that the legislature included relationships that it intended to include and excluded all other relationships. The statute is complete and legislatively intended as exclusive. Nowhere in the text of the UPA or other chapters of the RCW is the term *"de facto* parent" or "psychological parent" mentioned.

¶67 The majority improperly concludes that the legislature's failure to speak is somehow an invitation for this court to add further definitions or provisions to a statute that is clear, unambiguous, and all encompassing.[37] The

---

"(b) The man's having signed an acknowledgment of paternity under RCW 26.26.300 through 26.26.375, unless the acknowledgment has been rescinded or successfully challenged;

"(c) An adjudication of the man's paternity;

"(d) Adoption of the child by the man;

"(e) The man's having consented to assisted reproduction by his wife under RCW 26.26.700 through 26.26.730 that resulted in the birth of the child; or

"(f) A valid surrogate parentage contract, under which the father is an intended parent of the child, as provided in RCW 26.26.210 through 26.26.260." RCW 26-.26.101.

[35] Indeed I, like the statute, prefer the (unqualified) term "mother," and would not normally have to add "birth" were it not for the unfortunate context of decisions such as the majority.

[36] Note, however, there may have been earlier times when she arguably could have complied, e.g., by adoption *if* L.B.'s mother agreed.

[37] The Court of Appeals directly and improperly concluded that the legislature invited the courts to make the law in this area. *See In re Parentage of L.B.*, 121 Wn. App. at 475-76. This conclusion violates the doctrine of separation of powers and improperly suggests that a court may write (or add to) any law it deems incomplete or unsatisfactory.

majority's conclusion is wrong on the facts and violates our long-standing rules of statutory construction.

¶68 That the legislature neither intended a *"de facto"* parent nor intended the courts to provide such cause of action is evidenced by the legislative determination not to create such a status or cause of action following the Court of Appeals decision in *State ex rel. D.R.M. v. Wood*, 109 Wn. App. 182, 34 P.3d 887 (2001) (State petitioned to impose child support on former same-sex partner of woman who conceived a child through artificial insemination while the women were a couple). That case involved a different issue than the present case—child support obligation, not parentage, was before the court. However, the fact pattern served to alert the legislature to the situation that arises when an unmarried couple (sexual orientation irrelevant) conceive through artificial insemination and later cease to be a couple. Were this situation not already considered by the legislature, the Court of Appeals' decision specifically alerted the legislature. *See id.* at 195. The court stated: "If the marriage statute, adoption statute, UPA presumptions or surrogacy statute are inadequate when an unmarried couple, same gender or not, conceive artificially, *it is up to the Legislature to make any changes.*" *Id.* (emphasis added).

¶69 The legislature chose not to amend the UPA and not to create a *"de facto"* parent. The legislature has spoken. "When the legislature has assumed to speak upon a given subject, courts must take its expression as it is, and if it be certain in its terms, there is no reason for speculation as to its reasons, nor warrant for adding anything to meet a given case." *In re Estate of Adler*, 52 Wash. 539, 547, 100 P. 1019 (1909). As the UPA is the exclusive method for determining parentage, the majority errs by finding a court power to legislate further (and to legislate inconsistently).

¶70 I also find the majority's decision in this case inconsistent with another recent case. This court declined to reach the issue of *"de facto"* parentage, although the petitioner argued the issue in her supplemental brief, in the case of *In re Custody of Brown*, 153 Wn.2d 646, 651 n.3, 105

P.3d 991 (2005). In *Brown*, petitioner Gail Luby—the paternal grandmother of minor child S.H.B.—filed a nonparental custody petition and argued that she should be afforded the rights of a parent under the similar doctrine she labeled "in loco parentis." *Id.* at 652. The facts established that S.H.B. was two years old when her parents (who had drug problems) left her in the care of Luby. *Id.* at 648-49. Luby then lived with and cared for S.H.B. for the next six years. *Id.* Applying Luby's facts to the majority's new test for *"de facto"* parent, Luby would qualify. From the facts of that case it appears that (1) S.H.B.'s natural parents consented to and fostered the parent-like relationship; (2) Luby and S.H.B. lived together in the same household; (3) Luby assumed obligations of parenthood, including support, without expectation of financial compensation; and (4) Luby was in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature. *See id.* at 648-49. Despite these facts, this court did not reach or create the *"de facto"* parent analysis or rewrite the statute.

¶71 Luby's claim is far better than Carvin's in many respects. L.B. never lived separately with Carvin. Moreover, the record is unclear regarding Carvin's contributions to the financial support of L.B.; she admitted no contribution in the years since the litigation commenced. Wash. State Supreme Court 17:34, 18:32 (Feb. 15, 2005), *audio recording by* TVW, Washington State's Public Affairs Network, *available at* http://www.tvw.org.

¶72 Luby's story was less persuasive in other respects— she had been arrested and pleaded guilty to drug charges (marijuana). *Brown*, 153 Wn.2d at 649-50. This fact (and others) made it evident that it may not have been in S.H.B.'s best interests to stay with Luby. However, such facts are irrelevant to a determination of a *"de facto"* parent under the majority's new test. That the court chose not to address *"de facto"* parentage with Luby is evidence that the majority's decision today is crafted to suit these facts and current notions of political correctness. It is doubly unfor-

tunate that this court, and the court below, has determined to pursue such ad hoc decision making with respect to poor little L.B.—a most vulnerable subject.

¶73 Also unfortunate in this case is the majority's usurpation of the legislature's role in government. The majority claims that "Washington courts have not hesitated to exercise their common law equitable powers to award custody of minor children." Majority at 699. However, to do so in this case was improper as the majority goes against the express intent of the legislature. *See infra* pp. 717-19.

¶74 Previously, this court has properly declined to look beyond the statutory enactments of the parentage act to create the interests of a "psychological parent." *See In re Dependency of J.H.*, 117 Wn.2d 460, 476, 815 P.2d 1380 (1991). In *In re Dependency of J.H.*, the court properly declined to create an equitable cause of action when the statutory scheme did not provide one, stating, "[a]t the present time, foster parents have not been accorded a statutorily recognized expectancy in a continued relationship between themselves and their foster children, even in instances where foster parents may in fact have become the 'psychological parents' of the foster children." *Id.*

¶75 The court properly decided not to act as a legislature in *In re Dependency of J.H.*, but unfortunately today the same restraint is not shown. This court should have continued to follow the long precedent and declined to usurp the legislature's role.

¶76 The majority wishes to act with the wisdom of Solomon in not only implementing but making the law in this sensitive family law area. Solomon's famous case with two women claiming the same baby had a different point, however, badly misapprehended by the majority. Solomon threatened to cut the baby in half in order to determine the *real* mother, to whom he restored full custody. 1 *Kings* 3:16-28. The court today holds an actual division more wise

and sends the case and the child to lower courts for that division. Poor little L.B.

¶77  I dissent.

SANDERS, J., concurs with J.M. JOHNSON, J.