149 P.3d 433 (2006)
In re the DEPENDENCY OF DM & SR.
Janice M. and Charles B., Appellant,
v.
Department of Social & Health Services, Respondent.
Nos. 33611-1-II, 33621-9-II.
Court of Appeals of Washington, Division 2.
December 20, 2006.
*434 Manek R. Mistry, Jodi R. Backlund, Backlund & Mistry, Olympia, WA, for Appellant.
Stephen H. Hassett, Office of the Attorney General, Olympia, WA, for Respondent.

OPINION PUBLISHED IN PART
HUNT, J.
¶ 1 Janice M. and Charles B.[1] appeal superior court orders vacating their non-parental custody of children SR and DM. They argue that (1) because they were de facto parents and legal custodians of SR and DM, the trial court wrongly denied their rights to participate in the proceeding to terminate the children's biological parents' rights; and (2) the trial court erroneously vacated their non-parental custody status. Holding that (1) Janice and Charles were not de facto parents under In re Parentage of L.B., 155 Wash.2d 679, 122 P.3d 161 (2005), and (2) that they were no longer the children's legal custodians when the biological parental rights were terminated, we affirm.

FACTS
¶ 2 DM, born May 15, 1996, and SR, born March 22, 1998, are the biological children of "Jane" M.[2] In early 1999, Jane left DM and SR with her domestic partner. When Jane failed to return for the children, her domestic partner contacted Jane's sister, Janice, who picked up the children. Thereafter, the children lived with Janice and her long-time live-in partner, Charles, who is not related to either SR or DM.
¶ 3 Janice and Charles petitioned the superior court for non-parental custody of SR and DM. The children had contact with a Child Protective Services (CPS) social worker, who supported Janice and Charles' petition.[3] On July 12, 1999, the superior court entered a non-parental custody decree,[4] awarding custody of DM and SR to Janice and Charles under former RCW 26.10.030 and 26.10.040 (1998).[5] DM and SR continued to live with Janice and Charles.

I. DEPENDENCY PROCEEDINGS
¶ 4 Sometime after the decree was entered, CPS started receiving referrals alleging physical and emotional abuse of SR and DM while in Janice and Charles' care. Between April 1999 and March 2003, CPS received 14 separate referrals, most of which CPS determined were unfounded or inconclusive.[6]
*435 ¶ 5 On March 24, 2003, the Department of Social and Health Services (Department) filed dependency petitions for SR and DM in juvenile court. The juvenile court appointed an attorney for Janice and Charles, who participated as full parties in these dependency proceedings. The juvenile court entered a shelter order removing SR and DM from Janice and Charles' custody.
¶ 6 On April 29, 2003, Janice, Charles, and their attorney signed agreed orders of dependency for both children. In this order Janice and Charles agreed that (1) they had abused and neglected the children under RCW 13.34.030(5)(b); and (2) the children had no parent or custodian capable of adequately caring for them, such that their circumstances constituted a danger of substantial damage to their psychological or physical development under RCW 13.34.030(5)(c). These agreed orders expressly incorporated as established facts all of the dependency petitions' abuse and neglect allegations.[7]
¶ 7 Janice and Charles also agreed to a RCW 13.34.130 disposition order that required their participation in Department services, including psychological evaluations, anger management assessment, and parenting classes. The Department's permanent plan was to offer services to Janice and Charles while it assessed the possibility of returning the children to their custody. Concurrently contemplating the possibility of vacating Janice and Charles' non-parental custody decree, the Department also searched for other prospective relatives and explored alternative placement plans for the children.
¶ 8 On September 23, 2003, the juvenile court held a dependency review hearing and entered a Permanency Planning Order, signed and acknowledged by Janice and Charles' attorney. This permanency planning order (1) adopted the Department's Individual Service and Safety Plan (ISSP), which included reviews of the children, Janice, *436 and Charles; (2) continued the permanent plan to reunite the children with Janice and Charles; and (3) specified adoption by someone other than Janice and Charles as the alternative plan. The Department expressed concern because neither Janice nor Charles had made substantial efforts to complete the required services and neither had shown progress in problematic areas.[8]
¶ 9 From September through May 2004, the children continued to live and to thrive in foster care. Meanwhile, Janice and Charles continued Department services. Around November 11, 2003, the juvenile court entered an order allowing Janice and Charles weekly supervised visits with SR and DM.

II. VACATION OF NON-PARENTAL CUSTODY DECREE
¶ 10 Janice and Charles' service providers, including those who had performed psychological evaluations, psychosexual evaluations, polygraph, and anger management/domestic violence evaluations, recommended that the children not be returned to Janice and Charles. Based on these recommendations, the Department began efforts to set aside the non-parental custody decree and to terminate "Jane's" parental rights so the children would be available for adoption. In May 2004, the juvenile court granted the Department's motion to intervene in Janice and Charles' non-parental custody proceedings and to consolidate those proceedings with the children's dependency proceedings.[9]
¶ 11 In preparation for a dependency review hearing, the Department filed an updated ISSP. This ISSP (1) changed the permanent plan to prepare the children for adoption by someone other than Janice and Charles; (2) stated that the Department was taking steps to vacate the non-parental custody decree and to terminate the biological mother's parental rights; (3) noted Janice's myriad deep-rooted psychological problems,[10] which had caused the service providers to recommend that SR and DM not return to Janice and Charles. On October 19, 2004, Janice, Charles, and their attorney appeared at the dependency review. The juvenile court entered a permanency planning order, adopting the Department's revised ISSP in its entirety, including changing the children's primary permanent plan to adoption instead of returning them to Janice and Charles.
¶ 12 Meanwhile, the Department moved to set aside Janice and Charles' non-parental custody decree, and gave them notice that a hearing was set for December 7, 2004. At the hearing, Dr. David Hawkins, clinical psychologist, testified that, based on his evaluations performed over a year earlier, both *437 Janice and Charles had significant parenting problems and would not be able to change their behavior. The Department called several other witnesses. Janice and Charles called Kathy Drape, Head Start supervisor, other friends and neighbors familiar with their household, and the court-appointed special advocate (CASA) who opined that the children should be returned to Janice and Charles under supervision. At the conclusion of the hearing, the juvenile court (1) reserved ruling because of conflicting evidence, (2) requested an updated evaluation of Janice and Charles by Dr. Hawkins and greater evidence, and (3) continued the matter for six months for further review.
¶ 13 On June 21, 2005, the hearing resumed. Again, Dr. Hawkins testified, opining that, although both Janice and Charles had made significant strides in their parenting skills, Janice still lacked responsibility for her prior abusive actions and she "slipped into playing the victim." Nonetheless, Dr. Hawkins cautiously recommended that the Department continue providing services to Janice and Charles for six to twelve months to see whether the children could be returned to them.
¶ 14 Noting the instances of bed-wetting, and Janice and Charles' abuse, neglect, slapping, and using belts on the children, "the whole nine yards,"[11] the juvenile court vacated the non-parental custody decree. On August 8, 2005, the juvenile court entered an order, including findings of fact and conclusions of law, vacating the non-parental custody decree and dismissing Janice and Charles from SR and DM's dependency proceedings.

III. TERMINATION OF BIOLOGICAL PARENTAL RIGHTS
¶ 15 Sometime after vacating Janice and Charles' non-parental custody of SR and DM, the juvenile court held a separate hearing terminating the parental rights of the children's biological mother, "Jane," based on a finding of aggravated circumstances.[12] The juvenile court did not allow Janice and Charles to participate in the termination proceeding.

IV. APPEAL
¶ 16 Janice and Charles appeal the juvenile court's order vacating their non-parental custody decree. They also challenge their exclusion from the biological mother's parental termination proceedings. We consolidated their appeals.

ANALYSIS

I. EXCLUSION FROM BIOLOGICAL MOTHER'S PARENTAL TERMINATION
¶ 17 Janice and Charles contend that (1) they are the children's de facto parents under the doctrine recognized in L.B., 155 Wash.2d 679, 122 P.3d 161; (2) therefore, as "parents," they were entitled to participate in the children's biological mother's parental termination proceedings under RCW 13.34.180 and RCW 13.34.190; and (3) the trial court erred in excluding them from those proceedings.
¶ 18 The Department responds that (1) Janice and Charles cannot raise this argument for the first time on appeal because they did not raise it at the hearing vacating their non-parental custody decree; and (2) Janice and Charles do not qualify as de facto parents. Agreeing with the Department's second point and finding it dispositive, we do not address the first.

A. Janice and Charles Are Not De facto Parents
¶ 19 In L.B., two long-time female partners decided to have a child by artificial *438 insemination. One woman gave birth to a child and was, therefore, the child's legal mother. The other woman, however, did not take steps to adopt the child and to become the child's other legal parent. Six years later, the women's relationship ended. The non-child-bearing woman sought a judicial determination of co-parentage. L.B., 155 Wash.2d at 682-83, 122 P.3d 161.
¶ 20 In response, our Supreme Court recognized the common law doctrine of de facto parent status, for which it adopted the following criteria:
(1) the natural or legal parent consented to and fostered the parent-like relationship, (2) the petitioner and the child lived together in the same household, (3) the petitioner assumed obligations of parenthood without expectation of financial compensation, and (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature.
L.B., 155 Wash.2d at 708, 122 P.3d 161.[13] The Court also noted, "A de facto parent is not entitled to any parental privileges, as a matter of right, but only as is determined to be in the best interests of the child at the center of any such dispute." Id. at 708-09, 122 P.3d 161.
¶ 21 Janice and Charles fail to meet even the first L.B. threshold criterion to establish de facto parent status. The record is replete with references to the uncontroverted fact that the children's biological mother, "Jane," left SR and DM with her domestic partner. It was "Jane's" partner who then contacted and transferred the children to Janice and Charles, not the mother, who apparently abandoned the children altogether.
¶ 22 Moreover, nothing in the record shows that "Jane" was even aware that her children were living with Janice and Charles, let alone affirmatively consented to or fostered Janice and Charles' parent-like relationship with her children. Under a plain reading of the L.B. criterion, even if Jane had been aware of her children's living situation, her mere passive acquiescence would not have satisfied the threshold requirement for establishing de facto parent status.[14] Janice and Charles having failed to meet the first requirement, we need not address the remaining three de facto parent requirements.
¶ 23 Accordingly, we hold that (1) Janice and Charles were not the children's de facto parents; (2) because Janice and Charles were neither de facto nor any other form of legal parents for DM and SR, they were not "parents" within the meaning of RCW *439 13.34.180 and RCW 13.34.190;[15] and (3) therefore, Janice and Charles were not entitled to participate in the proceedings to terminate the biological mother's parental rights to the children.[16]
B. Legal Custodial Status Terminated
¶ 24 Alternatively, Janice and Charles argue that, as the children's legal custodians under the non-parental custody decree, they had a right under RCW 13.34.180 and 13.34.190 to participate in the proceedings to terminate the biological mother's rights. The Department concedes that Janice and Charles would be "technically correct in that if they had still been parties to the dependency at the time a termination petition was filed, they would have been entitled to notice and the opportunity to participate in the termination proceedings."[17] Br. of Resp't at 6.
¶ 25 Until the juvenile court vacated Janice and Charles' status as legal custodians, they were parties to the children's dependency proceedings. But after the juvenile court vacated their non-parental custody decree, Janice and Charles were no longer entitled to participate in the children's dependency; nor were they legally entitled to participate in the biological mother's parental termination proceedings. These rights extend only to those parties to whom the Legislature has given legal "parent" status under RCW 13.34.180 and 13.34.190. And Janice and Charles do not fall within any of these statutory categories.[18]
¶ 26 Janice and Charles rely on Blume v. Dep't of Soc. & Health Servs. (In re J.W.H.), 147 Wash.2d 687, 57 P.3d 266 (2002).[19] In Blume, the aunt and uncle's status as the children's legal custodians gave them a statutory right under RCW 13.04.011(6) to present evidence at the dependency proceedings. Blume, 147 Wash.2d at 696-700, 57 P.3d 266. *440 Thus, the Supreme Court held that the trial court in Blume erred when it excluded the aunt and uncle from participating in the dependency proceedings and entered a dependency order under RCW 13.34.030(5) after finding a lack of competent custodians to care for the children. Id. at 700, 57 P.3d 266.
¶ 27 Blume does not apply here. First, the biological parents in Blume affirmatively placed their children with the aunt and uncle; but here, the children's biological mother did not place the children with Janice and Charles. Second, Blume involved legal custodians' right to participate in dependency proceedings, not termination proceedings. Id. at 690, 57 P.3d 266. Here, Janice and Charles fully participated in the dependency proceedings, with the assistance of court-appointed counsel, until such time that the juvenile court vacated Janice and Charles' legal non-parental custodial status. After the juvenile court vacated their legal status, unlike the aunt and uncle in Blume, they no longer had a right to participate in the children's dependency proceedings. Moreover, at that point, the Department and the juvenile court had determined that it was not in the children's best interests to return to Janice and Charles.
¶ 28 Third, at the time of "Jane's" parental termination proceedings, Janice and Charles were no longer the children's legal custodians; nor were they the children's biological parents, adoptive parents, or de facto parents. RCW 13.34.110(1) requires that only the parent, guardian, or legal custodian shall have all of the rights provided in RCW 13.34.090(1) to participate in a termination proceeding, including notice and opportunity to be heard. Lacking any of these statuses, Janice and Charles had no standing and no statutory right to participate in the termination proceedings.
¶ 29 We hold, therefore, that the juvenile court neither erred nor denied Janice and Charles' rights when it excluded them (1) from the dependency proceedings, following vacation of their custodial status; and (2) from the parental termination proceedings against the children's biological mother.
¶ 30 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
We concur: HOUGHTON, C.J., and ARMSTRONG, J.
NOTES
[1] We use first names and initials for the non-parental custodians for clarity and to protect the children's anonymity. We intend no disrespect.
[2] To conform to COA II General Order 2006-1 and to distinguish between the children's biological mother and the children, for whom we use their real initials, we use the fictitious name "Jane" in place of the mother's real name or initials.
[3] The State of Oregon previously terminated Jane's parental rights to two older children.
[4] Jane neither identified a biological father nor appeared at these proceedings. Thus, the superior court entered the decree by default.
[5] In 2003, the Legislature amended chapter 26.10 RCW to require (1) a show cause hearing for nonparental child custody actions, and (2) the nonparent seeking custody to support his or her application with an affidavit and supporting facts declaring that the child is not in the physical custody of his parent and that neither parent is a suitable custodian. RCW 26.10.032(1) and (2).
[6] Beginning in 1990, Janice had contact with the Department of Social and Health Services about referrals alleging physical abuse and neglect of her own two children, whom she had raised with Charles' assistance.
[7] The Department's March 24, 2003 dependency petitions for SR and DM recounted a history of (1) 23 CPS allegations that Janice and Charles had abused or neglected SR and DM; and (2) Janice and Charles' alleged abuse of Janice's two children, beginning in 1990 when her children were much younger.

In addition, the Department's dependency petitions contained the following identical allegations with respect to both children:
Since April 1999 to present the department had received 15 referrals in regard to child abuse and neglect of [DM] and [SR] while in the care of [Janice and Charles] (referred to as Mom and Dad.) The referrals include the following allegations:
Mental Abuse: to include [Janice] yelling at the children, calling them names i.e., stupid liar, brats, and assholes. [DM] came to school with taped a(sic) note on his (sic) that read "[DM] pees his pants." He stated [Charles] had placed it there as he had an accident, child reported that following the school taking (sic) to [Janice] about spanking them that he was given a ride and did not ride the bus. [DM] also reported to a community professional "that he could not talk about stuff with people because my mom will call the people and have them taken away."
Physical Neglect: [Janice] self-reported to school that [DM] drinks out of the toilet water at home when he is thirsty as he is not allowed water due to his incontinence. Joshua [M., Janice's adult son] has been providing independent child care for [DM] and [SR] in spite of the parents agreeing with the department that Joshua would not be allowed to care for the children. There is urine and fecal matter in the home that has not been cleaned up for a few days,
Physical Abuse: [DM] reported and exhibited fear of Joshua and stated that he hurts him. When [Janice] was advised she told the child he and the referent he was a liar. There have been numerous referrals of children being beaten and having marks and bruising on their thighs, buttocks and face. The children have made numerous disclosures regarding physical abuse to school staff. Joshua is reportedly physically aggressive toward [DM] and his (sic) been known to spank him.
Clerk's Papers (CP) at 3-4.
The dependency petitions further alleged that (1) Charles hit the children with dishrags in their faces, leaving marks; (2) the children were slapped in the face and spanked daily, sometimes with a spatula; (3) Joshua M. dragged them around by their hair; (4) the children were placed in bed with urine and feces-soaked clothing; (5) the children were subjected to animal urine and feces in the home; (6) the children were given cold showers as punishment; (7) Joshua sometimes "choke slammed" the children; (8) the children were not allowed to have toys in their rooms; and (9) the children were left unsupervised at times. The children also reported that (1) they feared [Janice and Charles], and (2) DM went to school once with a cigarette-like burn on his face. CP at 3-4.
[8] The Department noted:

[Janice] has not been in compliance with her service plan during this review period. She has made very minimal progress with the services recommended.
[Janice] inquired about the parenting classes and showed for one session of a 10 week course. She made her psychological evaluation but was unable to complete some of the written work . . .
Concurrent planning has been discussed with [Janice] and time is running out. [Janice and Charles] need to complete the required services and recommendations or at least be invested in them by December 1, 2003. If significant progress has not been made by that time, steps will be taken to vacate the Non-parental Custody. The social worker has outlined for [Janice and Charles] what services need to be done.
CP at 104.
[9] Janice and Charles signed the consolidation order.
[10] On May 11, 2004, Department social worker Linda Smith submitted a progress report detailing the status of DM, SR, Janice, and Charles. This report stated that Janice would appear to be making changes and then would "reverts to her old behaviors of blaming" the Department and the children's biological mother for "turning them in." During conference calls with the Department, Janice would yell and storm out. Smith also felt Janice was, at times, "devoid of feelings" and at other times very angry. Smith observed Janice's personality changes consistent with her Domestic Violence test results. CP at 127.

This progress report also restated Dr. Hawkins's conclusions, based on a January 22, 2004 evaluation, that Janice has a "very volatile mood," did not take responsibility for the situation, had an "extremely poor prognosis for change," and appeared very angry and passive/aggressive. Dr. Hawkins concluded that Janice was "irritable, argumentative, suspicious, and blaming of others," without any desire to accept responsibility or change her behaviors, thus making DM and SR's return home "unsafe." CP 126-27.
[11] In granting the Department's motion to vacate the non-parental custody decree, the juvenile court stated:

I understand what Dr. Hawkins says, and you used a very good word a few moments ago, regret. I regret ever signing the first [non-parental custody] order in this case. That's one I have to live with. I am not going to re-live this thing. When I read what's going on with these kids and what's happened to these kids, you know, I don't need to entertain anyone in this courtroom; the lawyers know what I am talking about. The wetting, the abuse, the neglect, the slapping, the belts, the whole nine yards. I am not gambling again. I am vacating the third party order. The children are going to remain where they are and I am going to go from there. Thank you.
Report of Proceedings (RP) 235-36.
[12] The record before us on appeal does not include information about the biological mother's parental termination proceedings.
[13] "In addition, recognition of a de facto parent is `limited to those adults who have fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life.'" L.B., 155 Wash.2d at 708, 122 P.3d 161 (citing C.E.W. v. D.E.W., 845 A.2d 1146, 1152 (Me.2004)).
[14] At oral argument, Janice and Charles urged us to construe the de facto parental factors broadly. They argued that by "acquiescing" to Janice and Charles' nonparental custody, "Jane" "consented to and fostered the parent-like relationship" with DM and SR. We decline to adopt this view for two reasons: First, as we note above, the record shows that "Jane" abandoned them completely, not that she acquiesced to anything other than her initial handing the children over to her domestic partner. Second, Janice and Charles' proposed construction of the de facto parent doctrine is inconsistent with the Court's rationale in L.B.

Moreover, in adopting the de facto parent doctrine, our Supreme Court (1) noted that the Legislature "often fail[s] to contemplate all potential scenarios which may arise in the ever changing and evolving notion of familial relations," L.B., 155 Wash.2d at 706-07, 122 P.3d 161; and (2) recognized the doctrine only where an established custodial relationship, in the best interest of the child, is not otherwise protected by family law statutes. Id.
The paramount principle governing child placement, both at common law and in our Legislature's statutory codes, is and has always been the best interests of the child. Given the circumstances of this case, especially Janice and Charles' neglect and abuse of the children and their inability to correct their parenting deficiencies even when the juvenile court extended them extra time before finalizing the dependency order, we fail to see how it could have been in the children's best interests to return to Janice and Charles. As the noted in L.B., not even a de facto parent is "entitled to any parental privileges, as a matter of right, but only as is determined to be in the best interests of the child at the center of any such dispute." Id. at 708-09, 122 P.3d 161 (emphasis added).
[15] RCW 13.34.180(1) provides:

A petition seeking termination of a parent and child relationship may be filed in juvenile court by any party to the dependency proceedings concerning that child. Such petition shall conform to the requirements of RCW 13.34.040, shall be served upon the parties as provided in RCW 13.34.070(8).
RCW 13.34. 070(1) defines the parties as: "the parents, guardian, or custodian, and such other persons as appear to the court to be proper or necessary parties to the proceedings."
RCW 13.34.190 provides:
After hearings pursuant to RCW 13.34.110 or 13.34.130, the court may enter an order terminating all parental rights to a child only if the court finds that:
(1)(a) The allegations contained in the petition as provided in RCW 13.34.180(1) are established by clear, cogent, and convincing evidence; or
(b) The provisions of RCW 13.34.180(1)(a), (b), (e), and (f) are established beyond a reasonable doubt and if so, then RCW 13.34.180(1)(c) and (d) may be waived. When an infant has been abandoned, as defined in RCW 13.34.030, and the abandonment has been proved beyond a reasonable doubt, then RCW 13.34.180(1)(c) and (d) may be waived; or
(c) The allegation under RCW 13.34.180(2) is established beyond a reasonable doubt. In determining whether RCW 13.34.180(1)(e) and (f) are established beyond a reasonable doubt, the court shall consider whether one or more of the aggravated circumstances listed in RCW 13.34.132 exist; or
(d) The allegation under RCW 13.34.180(3) is established beyond a reasonable doubt; and
(2) Such an order is in the best interests of the child.
[16] Janice and Charles also assert that the trial court denied them substantive due process rights as de facto parents when it denied them participation in the biological mother's parental termination proceedings. Because we hold that Janice and Charles were not de facto parents, we do not further address this argument.
[17] The Department responds though, that (1) Janice and Charles cannot raise this issue upon appeal because they did not raise it before the trial court in their hearing to vacate their non-parental custody decree, and (2) they erroneously argue the case law.
[18] See n. 14.
[19] In Blume, the biological parents voluntarily placed their children with the paternal aunt and uncle, who subsequently petitioned for and received non-parental custody of the children. Blume, 147 Wash.2d at 690-91, 57 P.3d 266. At the biological parents' request, the trial court entered a dependency order (which included a finding that there were no available relatives with whom the children could live) without affording the aunt and uncle standing to object. Id. at 693-94, 57 P.3d 266. On appeal, the Supreme Court held that, as legal custodians of the children, the aunt and uncle had a right to intervene in the dependency proceedings. Id. at 699-700, 57 P.3d 266.