**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clientl/lawareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the matter of the Dependency of | No. 83086-4-I (consolidated with No. 83087-2-I and No. 83088-1) |
| A.N.C, J.M.M. and W.D.A. | DIVISION ONE |
| Minor Children. | PUBLISHED OPINION |

SMITH, A.C.J. — L.S.'s parental rights to her three children, A.N.C., J.M.M., and W.D.A., were terminated after a trial. She appeals. She contends (1) that the Department of Children, Youth and Families did not offer her all the services necessary to address her parenting deficiencies, (2) that the trial court erred by not exercising its equitable powers to encourage the parties to engage in open adoption agreement discussions, and (3) that the Department's open adoption agreement policies violate equal protection. Concluding that all necessary services were offered, no right to open adoption exists to be enforced through equity, and L.S. does not have standing to make her equal protection argument, we affirm.

FACTS

L.S. has three children: A.N.C., born in July 2008, J.M.M., born in September 2011, and W.D.A, born in March 2018. When L.S. realized she was pregnant for the third time, she began prenatal care. She tested positive for heroin, methamphetamines, and marijuana and sought methadone treatment.

No. 83086-4-I/2

The Department of Children, Youth and Families (DCYF) became involved after W.D.A.'s birth at Swedish Medical Center. The assigned social worker interviewed L.S. and staff at Swedish who had worked with her. Nurses were concerned about L.S.'s treatment of W.D.A; she had been seen falling asleep while holding the baby, which she denied, and she refused help from staff. L.S. disclosed to the social worker that she had PTSD[1] arising from a history of confinement and sexual assault. The social worker determined that L.S. also had a history with Child Protective Services, which had screened out[2] a total of 13 intakes reporting concerns of homelessness, drug use, neglect of the children, and that L.S. was the victim of domestic violence. DCYF asked her to sign a voluntary placement agreement for all three children. Initially reluctant, particularly after her partner, Nic Boaz,[3] became aggressive, L.S. eventually signed the agreement and the children were placed in foster care.

When their foster parents took the children to the dentist, A.N.C. had four cavities and J.M.M. had eight. Both had histories of tardiness and absence from school.

L.S. was referred to Home Builders services, but the Home Builders therapist was unable to reestablish contact with L.S. after their first meeting and

---

[1] Posttraumatic stress disorder.

[2] " 'Screened-out report' means a report of alleged child abuse or neglect that the department has determined does not rise to the level of a credible report of abuse or neglect and is not referred for investigation." RCW 26.44.020(25).

[3] Mr. Boaz's first name is spelled either "Nic" or "Nick" at various points in the record.

2

eventually ended the referral.  Dependency was established in June 2018 through an agreed order.

Three years followed in which the children lived with their foster parents and L.S was offered services in which she largely refused to engage.  The trial court ordered DCYF to provide L.S. with a range of services meant to address the mental health and substance abuse difficulties she faced.  DCYF complied, repeatedly providing L.S. with referrals to locations for urinalysis testing, psychiatric assessments, drug and alcohol evaluations, mental health counseling, and (though this had not been ordered by the court) domestic violence resources.  With a few exceptions—most notably receiving and picking up prescriptions for her mental health problems—L.S. did not begin to engage with these services.  She completed none of them.

In May 2020, two years after dependency began, DCYF petitioned for termination of L.S.'s parental rights, citing her continuing unaddressed parenting deficiencies.[4]  After a number of delays, trial took place in July 2021.  Testimony focused on several areas.  Substantial time was devoted to discussion of what services DCYF had offered and which of those L.S. had taken advantage of.  Also important was the degree to which L.S. visited with the children.  Of special concern was the impact of allegations that Boaz had at one point rubbed a urine-soaked rag in J.M.M.'s face.  L.S. denied that Boaz had been the perpetrator of this abuse, and she avoided addressing the impact of her own disbelief on

---

[4] It also petitioned to end the parental rights of the children's fathers.  The fathers' rights were terminated by default order after none appeared to contest the proceedings.

No. 83086-4-I/4

J.M.M. and A.N.C., who continued to display considerable discomfort at Boaz's mention.

After hearing evidence, but before issuing a final order, the court suggested that the parties might want to take the opportunity to continue negotiating an open adoption agreement if they wished to continue communication and contact after any termination of L.S.'s parental rights.[5]  The record does not indicate that any party attempted to do so.  The court issued oral findings and conclusions two days later and a final, written order terminating L.S.'s parental rights on August 9, 2021.

L.S. appeals.

ANALYSIS

Standard of Review

We review a trial court's decision to terminate parental rights by considering "whether substantial evidence supports the trial court's findings of fact by clear, cogent, and convincing evidence."  In re Parental Rights of K.M.M., 186 Wn.2d 466, 477, 379 P.3d 75 (2016).  Because termination proceedings are "highly fact-specific," we defer to "the trial court's determinations of witness credibility and the persuasiveness of the evidence."  K.M.M., 186 Wn.2d at 477.  Whether the trial court's findings of fact support its conclusions of law is reviewed de novo.  K.M.M., 186 Wn.2d at 477.

---

[5] An open adoption agreement permits a parent to contract with prospective adoptive parents—and, if it has custody over the children, DCYF—to enable continued visitation after termination.  RCW 26.33.295.

4

No. 83086-4-I/5

<u>Provision of Necessary Services under RCW 13.34.180(1)(d)</u>

L.S. first challenges whether DCYF met its burden to prove that it had provided her with all the necessary services RCW 13.34.180(1)(d) obligates it to. More specifically, she argues that the DCYF failed to satisfy its obligation because it did not provide her with parenting classes. We disagree and conclude that all necessary services were provided.

Parents possess a fundamental liberty interest in the custody and care of their children. <u>Santosky v. Kramer</u>, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). For the State to terminate those parental rights, it must first demonstrate by clear, cogent, and convincing evidence that it has met six statutory requirements laid out in RCW 13.34.180(1). RCW 13.34.190(1)(a)(i). "Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown by the evidence to be 'highly probable.' " <u>In re Dependency of K.R.</u>, 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (quoting <u>In re Welfare of Sego</u>, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). After it meets this burden, the State must also show, this time by a preponderance of the evidence, that termination is in the best interests of the child. RCW 13.34.190(1)(b); <u>In re Dependency of A.V.D.</u>, 62 Wn. App. 562, 571, 815 P.2d 277 (1991).

At issue here is the fourth of the six statutory factors that must be demonstrated by clear, cogent, and convincing evidence. It requires "[t]hat the services ordered under RCW 13.34.136[6] have been expressly and

---

[6] RCW 13.34.136 concerns permanency plans of care: court orders developed after a child has been removed from a home that guide attempts to address the conditions leading to that removal. Unless the court has already

5

understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d).

The trial court ordered provision of—and L.S.'s compliance with—a number of services under RCW 13.34.136: (1) random urinalysis testing (UAs) twice a week for 90 days; (2) a drug/alcohol evaluation and L.S.'s compliance with resulting recommendations; (3) a psychiatric assessment for medication management and L.S.'s compliance with resulting recommendations; (4) individual mental health counseling and L.S.'s compliance with resulting recommendations; and (5) a psychological evaluation with a parenting component and L.S.'s compliance with resulting recommendations. L.S. does not assign error to the trial court's finding of fact 2.11: "Services ordered under RCW 13.34.130[7] have been expressly and understandably offered or provided to the mother." Because unchallenged findings are verities on appeal, we need not analyze whether DCYF met its burden to demonstrate it provided these services; the findings establish that they did. See Robel v. Roundup Corp., 148

---

ordered that a termination petition be filed, permanency plans must include "what services the parents will be offered to enable them to resume custody." RCW 13.34.136(2)(b)-(b)(i).

[7] RCW 13.34.180(1)(d) references services ordered under RCW 13.34.136, the permanency planning provision, see supra n.5, not services ordered under RCW 13.34.130, which concerns dispositional orders. That the findings here instead refer to RCW 13.34.130 is not error. These services were ordered as part of a dispositional order. RCW 13.34.136(1) contemplates dispositional orders incorporating permanency planning.

Wn.2d 35, 42, 59 P.3d 611 (2002) ("[u]nchallenged findings are verities on appeal").

Still at issue is whether DCYF adequately demonstrated that it provided all the "necessary services" required by RCW 13.34.180(1)(d). " 'Necessary services' " are services that are " 'needed to address a condition that precludes reunification of the parent and child.' " K.M.M., 186 Wn.2d at 480 (quoting In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014)). Services must therefore be tailored to the parent's needs; parents face different challenges and require different assistance. In re Parental Rights of D.H., 195 Wn.2d 710, 727, 464 P.3d 215 (2020). A service that is not reasonably available to a parent is not a necessary service. K.M.M., 186 Wn.2d at 480-81.

Here, we conclude that substantial evidence supports the trial court's finding that all necessary services were offered. The parties' dispute concerns whether certain services, specifically "parenting classes and parent coaching services," were necessary. Neither service was expressly offered by DCYF. Instead, seeking to fulfil the trial court's order to provide a psychological evaluation with a parenting component, DCYF referred L.S. to Dr. Sierra Swing. As explained by Mary Tran, the social worker, the goal of this referral was to assess L.S.'s background, observe her interactions with her children, and determine how her mental health issues impacted her parenting. Dr. Swing would then have made recommendations to L.S. and DCYF regarding the services she felt would address L.S.'s particular parenting deficiencies. L.S.

7

never followed up on DCYF's two referrals to Dr. Swing, missing at least two meetings.

Tran testified that Dr. Swing's mental health-focused provision of parenting services was appropriate because L.S. was not yet ready to benefit from parenting classes or coaching services, and, if her mental health issues were addressed, may not have needed them at all. She judged that "the essence of [L.S.'s] parental deficiencies was her mental health." Tran described one illustrative instance: during a visit with her children, L.S. apparently either ignored or simply did not hear J.M.M.'s repeated requests for food and later denied that they had been made at all. On another occasion, L.S. became inordinately frustrated when W.D.A., then two years old, drew on one of L.S.'s pictures. Tran believed L.S.'s mental health problems were at the core of her parenting difficulties and required resolution before typical parenting classes would be useful.

The record, and particularly Tran's testimony, contains substantial evidence to support the trial court's finding that all necessary services reasonably available were offered. DCYF referred L.S. to Dr. Swing to assess the ways in which her mental health problems impacted her parenting and to determine what services would best address those deficiencies. It is possible that Dr. Swing may have concluded that L.S. would have eventually benefited from parenting classes. But her mental health problems were "the essence of [her] parental deficiencies," and if those problems had been addressed, other parenting services may never have been necessary at all. Even if parenting classes were

recommended, Dr. Swing's evaluation would have helped to specify precisely what sorts of parenting classes, focusing on what services, would have been most useful.

Regardless, because L.S. did not follow through on her referral to Dr. Swing, even parenting classes that may have helped were not reasonably available to L.S. This provides further support for the conclusion that they were not a necessary service. See K.M.M., 186 Wn.2d at 480-81 (family therapy not reasonably available—and therefore not necessary—because its prerequisite, reunification, had not been achieved).

L.S. contends that "[w]hen a parent has co-occurring deficiencies, [DCYF] may not provide remedial services sequentially." She cites to In re Termination of S.J., in which the court concluded that DCYF failed to offer necessary services because mental health and sobriety treatment were not integrated but instead sequential. 162 Wn. App. 873, 882, 256 P.3d 470 (2011). But S.J. does not stand for the proposition that any sequential services are a per se violation of RCW 13.34.180(1)(d). Its inquiry was highly fact-specific, and was particularly concerned with the legislature's finding that co-treatment of mental health and chemical dependency is more effective than unintegrated treatment. S.J., 162 Wn. App. at 881-82. Only a few years later, the Washington Supreme Court issued its decision in K.M.M., in which it affirmed denial of family therapy because testifying service providers indicated that its precondition, reunification, had not been achieved. 186 Wn.2d at 483. Given that, sequential provision of services is not categorically prohibited by RCW 13.34.180(1)(d).

9

No. 83086-4-I/10

Finally, L.S. asserts that we should discount Tran's testimony. She argues that Tran "was not an expert in mental health or parenting education" and that her experience as a case manager did not qualify her as an expert capable of speaking to the "necessity for a sequential approach." We note first that a trial court's decision to admit expert testimony is reviewed for abuse of discretion. In re Det. of Anderson, 166 Wn.2d 543, 549, 211 P.3d 994 (2009). Tran had worked as a social worker with DCYF for three years at the time of trial. She has a bachelor's degree in social work and was in the midst of her master's degree in social work during proceedings. She has participated in a number of trainings aimed at providing informed social services, and has previous work experiences assisting disadvantaged families. The trial court admitted her as an expert on that basis. We reject L.S.'s argument that Tran's testimony fell outside the scope of her expertise or that its admission or the trial court's reliance on it was error; it was precisely within her expertise, which is in how to provide services to parents and children.

L.S.'s Additional Assignments of Error to the Court's Findings of Fact

L.S. assigns error to a number of the trial court's findings of fact and conclusions of law. She does not dedicate any part of her briefing to arguments explicitly addressing these findings and conclusions. "A party that offers no argument in its opening brief on a claimed assignment of error waives the assignment." Brown v. Vail, 169 Wn.2d 318, 336 n.11, 237 P.3d 263 (2010). Many of these assignments are thematically linked with her arguments about RCW 13.34.180(1)(d) and whether parenting classes were a necessary service,

10

and so were indirectly addressed in that portion of her briefing and the corresponding portion of this opinion.

Regardless of whether the assignments are waived, substantial evidence supports the challenged findings. Testimony from Mary Tran, the social worker, supported findings 2.20(m), 2.22, 2.23, and 2.54. Testimony from Chantal Califano, the visitation supervisor, supported finding 2.24. Testimony from both Tran and Califano, as well as L.S. herself, supported findings 2.24, 2.28, 2.30, 2.35, and 2.36. Findings 2.37, 2.39, and 2.77—phrased as statements of the trial court's opinion or an "incorporation" of the testimony of the court appointed special advocate (CASA) and Tran—are supported by the same testimony. And the testimony of Lawrence McCann, a service provider at Harborview Medical Center, supports finding 2.51. The conclusions of law are supported by the trial court's findings.

None of these assignments, which receive no particularized attention by L.S., is a basis for reversal. The findings are supported by substantial evidence.

<u>The Court's Equitable Power to Order Open Adoption Meetings</u>

L.S. next contends that the trial court failed to recognize and exercise an equitable power to order the parties to undertake post-trial efforts to reach an open adoption agreement before entering a final termination order. DCYF contends that L.S. did not preserve this issue for appeal and that we need not consider it as result. While we agree with DCYF that the issue was not

preserved, we nevertheless exercise our discretionary power under RAP 2.5(a)(3) to review it and we conclude that no such equitable power exists.[8]

### 1. Traditional Equitable Power Analysis

Generally, equitable relief may be granted only where the party requesting it has " 'a clear legal or equitable right' " and a " 'well-grounded fear of immediate invasion of that right' " that will cause substantial injury. Kucera v. Dep't of Transp., 140 Wn.2d 200, 209, 995 P.2d 63 (2000) (quoting Tyler Pipe Indus., Inc. v. Dep't of Revenue, 96 Wn.2d 785, 792, 638 P.2d 1213 (1982)). Additionally, "[e]quitable relief is available only if there is no [other] adequate legal remedy." Orwick v. City of Seattle, 103 Wn.2d 249, 252, 692 P.2d 793 (1984). Most often, the courts' equitable powers therefore serve the limited but crucial purpose of enabling remedy to enforce an existing right where remedy would not otherwise be available under the law.

Here, there is no basis for the exercise of any equitable powers by the trial court because L.S. does not have a right to an open adoption agreement. RCW 26.33.295 governs the creation of open adoption agreements, stating "[n]othing in this chapter shall be construed to prohibit the parties to a proceeding under this chapter from entering into" open adoption agreements. RCW 26.33.295(1). It permits legally enforceable adoption agreements only when their terms are set forth in a written court order agreed to by: (1) any birth

---

[8] Washington appellate courts "may refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a). Here, the court sua sponte mentioned open adoption at the close of trial, but no party made an argument about the court's potential equitable powers.

parent with unterminated parental rights; (2) the prospective adoptive parents; (3) a representative of DCYF, if the agency has custody of the child at issue or their sibling(s); and (4) if one exists, the child's attorney or guardian ad litem in a child custody proceeding. RCW 26.33.295(2). Any agreement must then be approved by the court, which must find that open adoption would be in the child's best interests. RCW 26.33.295(2).

The provision does not, by its plain language, create a right. It instead allows for the various necessary parties to enter into an agreed order. After the court has determined that open adoption serves the best interests of the children involved, the order is then enforceable by the court. No statutory right exists to be enforced.

Nor is there a constitutional right to be equitably enforced. Due process guarantees parents' fundamental liberty interest in the "care, custody, and management of their child." Santosky, 455 U.S. at 753. But L.S. cannot rely on this guarantee to argue that due process creates a right to open adoption for the simple reason that the cessation of parental rights is one of open adoption's necessary prerequisites. While the rights created by open adoption in some ways resemble parental rights—they typically include, for instance, the right to visit with the children—they are not the extension of a constitutional parental right.

Due process does protect a parent's right to voluntarily relinquish their parental rights in certain circumstances. In re Welfare of H.Q., 182 Wn. App. 541, 553, 330 P.3d 195 (2014). Voluntary relinquishment is the process by

13

which a parent chooses to surrender their parental rights rather than having them involuntarily terminated at trial.  RCW 26.33.020(14), .080.

Though voluntarily relinquishment and open adoption often go hand in hand, however, a right to the former is not a right to the latter.  This is illustrated by H.Q.  There, the question was whether a parent's rights had been violated when he was not permitted to pursue voluntary relinquishment—and then open adoption—but was instead compelled to defend his parental rights in a termination trial after the trial court had concluded without a hearing that he was not competent to relinquish them.  H.Q., 182 Wn. App. at 545-48.  H.Q. concluded that a due process right to voluntarily relinquishment exists because "parents have the substantive due process right to pursue statutory alternatives to involuntarily termination."  182 Wn. App. at 553.  But open adoption is not itself an alternative to involuntary termination.  Open adoption is therefore not protected by due process.

We conclude that no statutory or constitutional right to open adoption exists to be enforced through exercise of the courts' equitable powers.

2.  The Courts' Equitable Powers Over Children's Best Interests

L.S. frames the matter differently.  She asserts that the trial courts have a basic equitable power enabling them to act in the best interest of children.  And so, she argues,

> [b]ecause the [termination and open adoption] statutes do not expressly address a situation where the superior court finds that termination is in the child's best interest but also finds that post-termination contact is in the child's best interest, equity may step into this statutory gap to act in the best interest of the child.

14

Her argument, in essence, urges the court to use its equitable powers first to recognize a right to open adoption and then to enforce that right. This argument is unavailing for several reasons. First, no finding was made in this instance that continued contact was in the best interest of the children.[9] Therefore, even in L.S.'s own representation, the facts of this case do not place it in any "statutory gap" permitting exercise of equity.

Second, however, her argument fails on its merits. The courts possess equitable powers to act in the best interests of children, powers ultimately derived from the King's—and then the State's—prerogative to act in *parens patriae* for his subjects. Chandler v. Chandler, 56 Wn.2d 399, 403, 353 P.2d 417 (1960). Trial courts therefore have broad authority to fashion equitable remedies regarding the welfare of children. In re Parentage of L.B., 155 Wn.2d 679, 697, 122 P.3d 161 (2005). Indeed, Washington courts relied solely on their powers in equity in matters affecting child custody disputes before the promulgation of legislation in this area. L.B., 155 Wn.2d at 697. But these particular equitable powers are not an unfettered license to impose the courts' preferred outcomes. As with equitable powers more generally, they exist to allow remedy where the legislature has not spoken, or has spoken only incompletely, through statute. Id. at 687.

---

[9] The trial court found that "[b]oth older children have expressed a desire to live with their foster family and wished their mother would have signed an open adoption agreement." In her briefing, L.S. interprets this finding from the court to be a finding that "post-termination contact is in the child[ren's] best interest."

No. 83086-4-I/16

In addition to providing remedy for an otherwise irremediable right, the courts' equitable powers over child welfare may also be used to *recognize* an underlying right that is then equitably enforceable. L.B., for instance, concerned parties in a same-sex domestic partnership who, with the help of a donor, conceived and raised a child together until their relationship ended when the child was six. Id. at 682. A bitter legal battle followed over whether the nonbiological parent had rights to parental custody. Id. at 682. The legislature had been "conspicuously silent when it [came] to the rights of children like L.B., who are born into nontraditional families, including any interests they may have in maintaining their relationships with members of the family unit in which they are raised." Id. at 694. The court therefore recognized an equitably derived de facto parent status entitling the nonbiological parent to the full rights of parenthood. Id. at 712.

Here, unlike in L.B., the legislature has not been silent. Instead, it has passed into law a statute specifically outlining how a parent may enter into an open adoption agreement upon termination of their parental rights. RCW 26.33.295. There is therefore no "statutory gap" into which equity may flow; the legislature has not left space for the creation of a court-recognized and enforced equitable right. Accord In re Custody of M.W., 185 Wn.2d 803, 822, 374 P.3d 1169 (2016) (declining to create equitable right to third party visitation where legislature had had opportunity to do so and expressly declined).

Another more pragmatic concern weighs against recognizing an equitable right, and its corresponding power to encourage parties to enter into open

16

adoption agreements: the prospective adoptive parents are not joined as parties to the termination action.  As a result, the court, even if it possessed an equitable power, would not have had the ability to order them to engage in negotiations. See Eagle Sys., Inc. v. Emp't Sec. Dep't, 181 Wn. App. 455, 459, 326 P.3d 764 (2014) (Due process requires personal jurisdiction for court's exercise of authority over a party); CR 12(b)(2) (allowing dismissal for lack of personal jurisdiction).  The exercise of equitable power would not provide a mechanism to obtain L.S.'s desired result because the adoptive parents' agreement is required to create an open adoption.

L.S. contended in her briefing and at argument that the court could nonetheless exercise its power over the parties that *are* in front of it—DCYF and the birth parent(s)—to require them to attempt facilitation of an open adoption agreement.  This argument is unconvincing.  Such an exercise of equitable powers would be too attenuated a form of relief and would be too difficult to enforce.[10]

For these reasons, we decline to recognize an equitable right held by parents to open adoption.  No parental right to open adoption exists—statutory, constitutional, or equitable—to be enforced through the courts' equitable powers after a termination trial has occurred.

---

[10] Would one e-mail from DCYF be enough for the agency to meet its obligations?  Could DCYF tell the prospective adoptive parents that they are under no obligation to attend any meeting?  L.S.'s requested relief would inevitably lead to further litigation over the reasonableness of DCYF's efforts.  This would occur even while the potential adoptive parents' incentives to agree to open adoption would have waned, given that the outcome of trial would be in little doubt and therefore their motivation to conciliate low.

Parents in termination proceedings are placed in a difficult position. They are often required to make heartrending choices between asserting their rights at trial or voluntarily relinquishing custody and care of their children in the hopes of maintaining some continued contact with their children through an open adoption agreement. But once they have decided to go to trial, when things look bleak, they may not rely on the court's equitable powers to require the parties to consider open adoption. The court's equitable powers to act in the children's best interest do not extend to this situation, and may not include individuals not subject to the court's authority.

<u>The Children's Equal Protection Rights</u>

L.S. finally contends that DCYF's practices and policies regarding open adoption agreements violate the children's equal protection rights. We conclude that she does not have standing to make this claim.

Once a termination order has been entered, "all rights, powers, privileges, immunities, duties, and obligations . . . between the child and parent shall be severed and terminated and the parent shall have no standing to appear at any further legal proceedings concerning the child." RCW 13.34.200(1). L.S. therefore no longer has standing to make an equal protection argument on her children's behalf in her appeal.

In light of this, L.S. asserts that she has third party standing to bring a claim on behalf of her children. Litigants do not usually enjoy the ability to bring a constitutional argument on behalf of a third party. <u>Mearns v. Scharbach</u>, 103 Wn. App. 498, 511, 12 P.3d 1048 (2000) (citing <u>Singleton v. Wulff</u>, 428 U.S. 106, 114,

18

96 S. Ct. 2868, 49 L. Ed 2d 826 (1976)).  Third party standing does exist, however, where: "(1) the litigant has suffered an injury-in-fact, giving them a sufficiently concrete interest in the outcome of the disputed issue, (2) the litigant has a close relationship to the third party, and (3) there exists some hindrance to the third party's ability to protect his or her own interests."  Mearns, 103 Wn. App. at 512.  Each of these elements is factual in nature, subject to case-by-case analysis.  See Singleton, 428 U.S. at 114-16 (discussing cases).

Here, it is the third element that is most relevant.  L.S. has suffered an injury-in-fact sufficient to satisfy the first element: the termination of her parental rights.  And she arguably has a close enough relationship to the children to satisfy the second element, though the termination of her rights casts some doubt on the matter.  But the children are not hindered in their ability to protect their own interests.  In fact, their ability to represent their interests at trial was potentially greater than L.S.'s, if only because they benefited from representation by two attorneys—A.N.C. had counsel, as did the CASA, whose purpose was to advocate for the best interests of all three children.  As a result, L.S. does not have third-party standing to bring a claim on her children's behalf.

L.S. relies on In re Dependency of M.S.R. to strengthen her third-party standing argument, but this reliance is misplaced.  174 Wn.2d 1, 271 P.3d 234 (2012).  The Washington Supreme Court in M.S.R. did not directly address how the mother there had standing to make a due process claim on behalf of her children when it considered her appeal.  174 Wn.2d at 11.  Where a legal theory is not discussed in a case's opinion, that opinion is not controlling in future cases

19

No. 83086-4-I/20

where the legal theory is properly raised. Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1, 124 Wn.2d 816, 824, 881 P.2d 986 (1994). But insofar as M.S.R. made a tacit assumption of third-party standing as L.S. argues, the case was notably different than this one because the children in M.S.R. had not been represented at the trial court. M.S.R., 174 Wn.2d at 11. The children here were, and this element is dispositive.

We affirm.

_Smith, A.C.J._

WE CONCUR:

_Coburn, J._          _Dwyer, J._

20